GRANDISON v. NATIONAL BANK OF COMMERCE OF ROCHESTER.

In re O. L. GREGORY VINEGAR CO.

(Circuit Court of Appeals, Second Circuit. February 15, 1916.)

No. 142.

1. BANKRUPTCY ⊕⊃159—PREFERENCES—RIGHT OF TRUSTEE.

A trustee in bankruptcy can recover property transferred when the debtor was insolvent, if the transfer was made within four months before the filing of the petition, or after the filing and before the adjudication, if the transfer enabled the creditor to obtain a greater percentage of his debt than other creditors of the same class, and the person who received it had reasonable cause to believe that it would effect a preference.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 247, 248, 262, 268–281; Dec. Dig. ⊕⊃159.]

2. BANKRUPTCY ⊕⊃163—PREFERENCES—"TRANSFER."

An assignment by an insolvent corporation to its president of accounts receivable as security for his indorsement of notes of the corporation, which accounts, when collected, were deposited in a separate fund and applied by the president to the payment of the notes indorsed by him, is a "transfer" by the corporation to the creditor, within the Bankruptcy Act.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 247, 248; Dec. Dig. ⊕⊃163.

For other definitions, see Words and Phrases, First and Second Series, Transfer.]

3. BANKRUPTCY ⊕⊃303(3)—PREFERENCES—EVIDENCE—INSOLVENCY OF CREDITOR.

In a suit by the trustee in bankruptcy to recover payments alleged to have been preferences, evidence *held* to show that the bankrupt was insolvent at the time the payments were made, and that a statement, showing its assets to have exceeded its liabilities, placed an exaggerated value on its assets.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 462; Dec. Dig. ⊕⊃303(3).]

4. BANKRUPTCY ⊕⊃54—PREFERENCES—"INSOLVENT"—"FAIR VALUATION."

Under Bankr. Act July 1, 1898, c. 541, § 1, cl. 15, 30 Stat. 544 (Comp. St. 1913, § 9585), declaring that a person shall be deemed "insolvent" whenever the aggregate of his property, exclusive of that conveyed or concealed with intent to defraud creditors, shall not at a fair valuation be sufficient in amount to pay his debts, the "fair valuation" of the assets is the fair market value or the fair cash value of the property as between one who wants to sell and one who wants to buy.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 54, 84, 85; Dec. Dig. ⊕⊃54.

For other definitions, see Words and Phrases, First and Second Series, Fair Value; Insolvent.]

5. BANKRUPTCY ⊕⊃161(2)—PREFERENCES—TIME OF TRANSFER—ASSIGNMENT TO SECURE INDORSER.

Where a corporation, by a resolution adopted more than four months before the filing of a petition in bankruptcy against it, authorized the assignment of certain accounts receivable to its president to secure him for indorsing notes of the corporation to be given in renewal of other notes as they should fall due, but no such notes were indorsed by him until within the four months' period, it will be presumed that the assignment was made at the same time as the indorsement, so that the transfer of the

⊕⊃For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

property, which was later applied by the president to the payment of the notes, could not be held to have taken place more than four months before the filing of the petition, under the state rule that, where an assignment of property is made for the protection of the surety, the courts will treat it as a trust for the benefit of the creditor.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 263; Dec. Dig. ⊕161(2).]

6. BANKRUPTCY ⊕165(1)—PREFERENCES—EFFECT OF TRANSFER.

Where a creditor to whom transfers of property were made received full payment of its claims, while other general creditors received nothing, unless those transfers and certain others were set aside, there can be no question that the effect of the transfer was to give the transferee a greater percentage of its debt than was received by other creditors of the same class.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 260; Dec. Dig. ⊕165(1).]

7. BANKRUPTCY ⊕166(5)—PREFERENCES—KNOWLEDGE OF CREDITOR.

Where the president of a bank was one of the incorporators of the bankrupt corporation, and knew the cost of its real estate, on which the bank held a mortgage, knew that the indebtedness of the corporation had greatly increased, that it was producing no more, but merely selling off what it had produced the previous season, that drafts drawn by it had gone to protest, and that the bank was pressing the corporation for payment of the indebtedness due it, and was having accounts assigned to it in order to collect its notes, the bank had knowledge or reasonable cause to believe that a preference was intended by payments made to it.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250, 251, 258; Dec. Dig. ⊕166(5).]

8. NOTICE ⊕6—CONSTRUCTIVE NOTICE—FACTS PUTTING ON INQUIRY.

Notice of facts which would put a man of ordinary prudence on inquiry under similar circumstances is notice of all the facts which a reasonably diligent inquiry would disclose.

[Ed. Note.—For other cases, see Notice, Cent. Dig. §§ 4–7; Dec. Dig. ⊕6.]

Appeal from the District Court of the United States for the Western District of New York.

Suit by Wilbur H. Grandison, as trustee of the estate of the O. L. Gregory Vinegar Company, bankrupt, against the National Bank of Commerce of Rochester. Decree for complainant (220 Fed. 981), and defendant appeals. Affirmed.

James M. E. O'Grady, of Rochester, N. Y., for appellant.

Thomas C. Burke, of Buffalo, N. Y. (Thomas C. Burke, Frank Gibbons, and Henry W. Pottle, all of Buffalo, N. Y., of counsel), for appellee.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge. This suit is brought by a trustee in bankruptcy to recover certain sums of money which it is alleged the defendant received preferentially, and which it is therefore not entitled to retain as against the complainant. The facts in this case are in some respects similar to those in the case of Grandison v. Robertson, 231 Fed. 785, —— C. C. A. ——, decided at this term, although in certain particulars they are dissimilar. In both cases the same plaintiff

brings the suit as trustee of the same bankrupt corporation. In both cases the court below adjudged certain payments to have been preferential and void, and required defendants to pay over to the trustee the payments thus found to have been preferential and void.

The bankrupt, the O. L. Gregory Vinegar Company, was and is a stock corporation existing under the Business Corporations Law of the state of New York. It was organized to carry on the business of manufacturing cider and vinegar in the city of Tonawanda, N. Y. An involuntary petition in bankruptcy was filed against it on February 15, 1910, and on March 4, 1910, it was adjudged a bankrupt, and on March 28, 1910, the complainant was appointed trustee of its estate. The transactions out of which the preferences arose were as follows:

Subsequent to October 15, 1909, four months prior to the filing of the petition in bankruptcy, the bankrupt assigned to O. L. Alexander, its president, certain accounts receivable belonging to it, and thereafter the said Alexander collected on the assigned accounts certain moneys which he deposited with the defendant in an account known as the "O. L. Alexander Collateral Account." It is averred that defendant knew that the moneys so deposited were the proceeds of the assigned accounts, and that it also knew that the accounts had been assigned to Alexander by the bankrupt in pursuance of a certain resolution adopted on October 12, 1909, which resolved:

"That this company assign to the said O. L. Alexander as collateral security for the indorsements, as above stated, accounts receivable of this company and the proceeds thereof aggregating an amount not exceeding twenty thousand dollars ($20,000),"

The moneys received from these assigned accounts were deposited in defendant's bank in the manner above stated. The defendant credited the account with the amounts so received and debited it with the amounts taken from it to apply upon the notes made by the bankrupt and indorsed by Alexander and held by defendant. This was done pursuant to Alexander's direction. On January 12, 1910, defendant had received out of this account $10,950 and applied it on the bankrupt's indebtedness. On or about January 17, 1910, the bankrupt paid to defendant to apply on its indebtedness the farther sum of $4,266.90.

The claim is, as to this last sum, that the bankrupt had sold in bulk to Wallace & Co. on January 17, 1910, its entire stock of goods, wares, and merchandise with the knowledge and consent of defendant, and upon the understanding and agreement that defendant would discount the notes of Wallace & Co. and apply the same in payment of the notes of the bankrupt held by defendant, and that the arrangement was made for that purpose. The amount so received and applied by defendant, with interest thereon, aggregated $19,917.74, which, with costs, brought the amount up to $20,017.44, and judgment for that sum was entered.

The preferential payments were alleged in the bill of complaint to have been "in violation of the provisions of the laws of the state of New York and of the United States of America."

[1] A trustee in bankruptcy is entitled under the Bankruptcy Act to recover a transfer of property if the following circumstances concur: (1) That a "transfer" of the property of the debtor has taken place. (2) That the debtor at the time of the "transfer" was insolvent.

(3) That the transfer was made within four months before the filing of the petition in bankruptcy, or after the filing and before the adjudication. (4) The transfer must enable the creditor to obtain a greater percentage of his debt than other creditors of the same class. (5) The person receiving it must have had reasonable cause to believe that the enforcement of the transfer would effect a preference.

If the record discloses that in this case the defendant has received transfers from the bankrupt under the circumstances above stated, the trustee is entitled to his decree by virtue of the act of Congress, and without reference to the New York Stock Corporation Law. That act only becomes important as respects this case if it appears that the defendant, at the time it received the transfers, did not have reasonable cause to believe a preference would result, and that the bankrupt made the payments with the intention of giving a preference; for under the New York statute a preference is void if made with an intent to give a preference, without reference to the state of mind of the party who received the payment. A very large part of the argument and brief of the defendant's solicitor has been devoted to a consideration of the New York Stock Corporation Law (Consol. Laws N. Y. c. 59). He maintains that the trustee in bankruptcy cannot, under the circumstances of this case, maintain an action under the New York act. We see no reason for considering that act at all. In this case the facts come within the provisions of Bankr. Act, § 60 (Comp. St. 1913, § 9644), and the trustee is not under the necessity of relying upon section 67e (section 9651), which enables a trustee to reclaim transfers made by a bankrupt when the transfers are null and void as against creditors "by the laws of the state, territory, or district in which such property is situate."

[2] I. That a "transfer" of the property of the debtor was made is certain. That several transfers were made to Alexander, and through him to defendant, is not denied. It is not essential that the transfers should have been made directly to defendant. Any method of depleting an insolvent fund is sufficient. See Remington on Bankruptcy, § 1300. As stated in National Bank of Newport v. National Herkimer County Bank, 225 U. S. 178, 184, 32 Sup. Ct. 633, 635 (56 L. Ed. 1042) (1912):

"To constitute a preference, it is not necessary that the transfer be made directly to the creditor. It may be made to another, for his benefit. If the bankrupt has made a transfer of his property, the effect of which is to enable one of his creditors to obtain a greater percentage of his debt than another creditor of the same class, circuity of arrangement will not avail to save it."

And in the same case the court, speaking through Mr. Justice Hughes, said:

"The 'accounts receivable' of the debtor—that is, the amounts owing to him on open account—are, of course, as susceptible of preferential disposition as other property; and if an insolvent debtor arranges to pay a favored creditor through the disposition of such an account, to the depletion of his estate, it must be regarded as equally a preference, whether he procures the payment to be made on his behalf by the debtor in the account, the same to constitute a payment in whole or part of the latter's debt, or he collects the amount and pays it over to his creditor directly. This implies that, in the former case,

the debtor in the account, for the purpose of the preferential payment, is acting as the representative of the insolvent, and is simply complying with the directions of the latter in paying the money to his creditor."

[3, 4] II. That the debtor was insolvent when the transfers were made is well established upon the record. The Bankruptcy Act has not left to the courts to define the meaning of the term insolvent. But it expressly declares that:

"A person shall be deemed insolvent within the provisions of this act whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, or removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, shall not, at a fair valuation, be sufficient in amount to pay his debts." Section 1, cl. 15.

To this definition the courts must strictly adhere. Counsel for defendant calls attention to a statement furnished by the bankrupt on September 1, 1909, which shows assets of $230,826.26 and liabilities exclusive of capital stock and profit of $100,803.46. Counsel, however, does not think this statement should be accepted at its face value, inasmuch as he insists that certain liabilities have been included which should have been excluded, and which would reduce the amount of liabilities to $76,208.06. We do not agree with him. The valuation placed upon land, buildings, and equipment, $109,380.00, was not "a fair valuation" of the property. When the bankrupt bought the property it made the purchase for $30,000. It paid $5,000 down and gave a mortgage for $25,000. This mortgage was afterwards assigned to defendant, the president of the defendant bank being one of the incorporators of the bankrupt. It is difficult to define what constitutes "fair valuation." It is much easier to say what is unfair valuation. In a case in the Southern district of New York in 1899, In re Martini, 93 Fed. 990, Judge Addison Brown thought that "fair valuation" was determined by the amount the property brought at a sale on execution shown to have been in all respects fair and reasonable. The debtor's stock in trade was sold under judgment and execution, and the court held that the debtor was bound by the result as to the valuation of the goods, and could not prove his solvency by higher estimates of their value if they had been free from levy and sold at retail, or in the ordinary course of business. In Duncan v. Landis, 106 Fed. 839, 45 C. C. A. 666 (1901), the Court of Appeals of the Third Circuit, speaking through Judge Gray, said:

"We think that the present market value of the property in question would be a fair valuation of the same, but there is nothing in this section of the act that authorizes that market value to be ascertained by what a purchaser would give who desired to take advantage of the necessities and embarrassments of the owner, in order to procure the same at a price less than its real or market value."

The term "fair valuation," as used in the Bankruptcy Act, means the fair cash value or the fair market value of the property as between one who wants to purchase and one who wants to sell the property. If the bankrupt had wanted to sell its property, the price it could have obtained for it upon the market from parties who wanted to buy and would give its fair value is the fair valuation which the

statute refers to. The price which the property would bring or does bring when forced off at auction under the hammer cannot be regarded as always fixing its fair market value. See Lawrence v. City of Boston, 119 Mass. 126 (1875).

On September 22, 1910, there was due and unpaid on the mortgage which the bankrupt had given on its plant $18,567.51. The mortgage was foreclosed, and on October 15, 1910, sold to defendant at the referee's sale for $14,000. In making up the bankrupt's schedule of assets the president of the bankrupt testified:

"We put our plant in at $25,000. We also placed in our schedule here the machinery, tanks, and equipment used in the conduct of the business at Tonawanda, N. Y., $5,000, so that the plant and equipment is in the bankruptcy schedules at $30,000; office furniture and fixtures are in at $500; that is what I thought the property would bring under a forced sale."

Bankrupts are not inclined to underestimate the value of the real estate they schedule. It appears that some time in 1908, before Alexander became connected with the bankrupt, a proposition was made to sell him the plant for $25,000. The purchase was not made, and apparently for the reason that Alexander could not borrow the money to pay for it. We are able to get some idea of the fair market value of the real estate from the testimony of the trustee. His testimony follows:

"I made an effort to sell the real estate and plant at Tonawanda. We obtained from the Board of City Despatch of New York a list of responsible cider and vinegar manufacturers in the United States; there were about 600 on the list, and we sent them advertisements of the property and when it was to be sold. The date fixed for the sale was June 24, 1910; the usual advertisement of that sale was given. We received no bids at the time of the sale; then I adjourned the sale in order to obtain private bids. I did not obtain any. The property was afterwards foreclosed by the defendant, so that I have at the present time converted into cash all the assets to the bankrupt."

The value of the accounts receivable entered on the statement of September 1, 1909, at $48,205.47, was much in excess of their real value. The testimony showed that in December, 1909, Alexander made a trip through the country to collect accounts. This he did upon the suggestion of the president of the defendant bank. Alexander testified:

"I found in collecting these accounts a great many of them shrunk a great deal. * * * The debtors disputed the accounts. In straightening up these accounts and collecting them, we made concessions; we simply had to settle on the basis of the man's understanding and agreement as to the manner in which they [the goods] were purchased."

And Swanton, in his testimony, referring to this attempt of Alexander to get in the accounts, said:

"I should say that the falling off in the amount of the accounts that were assigned to the bank directly, concerning which no question is raised here, was discovered on that trip of Mr. Alexander's to be somewhere between 30 and 40 per cent. I do not recall exactly what the gross amount in dollars of the losses amounted to. My recollection is that it was about $20,000."

There were several explanations given for this condition respecting the accounts. One was that in making sales Mr. Gregory, the for-

mer president, had agreed to allow certain discounts unknown to the home office; also that Gregory had agreed with the purchasers to furnish salesmen to push the goods in certain localities. This statement, therefore, made by the bankrupt as of September 1, 1909, cannot be accepted either as to the value of the real estate or as to the value of the accounts. The testimony shows that, whatever the accounts receivable may have been worth, such of them as were permitted to reach the hands of the trustee in bankruptcy amounted, along with his other receipts, to only $879.78. Of that amount $232 was realized from the sale of personalty; from "cash in drawer at plant" was realized 37 cents; from balance in bank was received $10.82. Common carriers paid back $166.50. There was a rebate on insurance of $128.25, and a returned premium of $6.72. The Merchants Despatch paid in $17.75 for damage to cider. All these several items aggregated $562.41. There are only three small items credited as having been received from "accounts," and they aggregate $79.47.

This is a very illuminating statement. Whatever may have been the value of the accounts receivable, that value had gone to this defendant and to the Robertsons. There was nothing left for the trustee, and nothing left for the general creditors, who had received nothing. The trustee testified that accounts which he had not collected he had found uncollectible. He said:

"Some of the reasons were that the goods were of no value, and there were misrepresentations as to the quality of the goods; the goods were received in broken casks and a large amount of leakage."

In view of the fact that after the payments made to defendants and the payments made to the Robertsons there still remains an indebtedness of $41,909.52, with nothing in the hands of the trustee except a balance of $144.18, which is not enough to defray the expenses of administration, we feel convinced, not only that the financial statement made by the bankrupt on September 1, 1909, did not place a fair valuation on the assets, but that it placed a much exaggerated value thereon. And we are also convinced that upon a fair valuation the assets were much below the total amount of the debts. In Grandison v. Robertson we said that this bankrupt was in our opinion insolvent from the time it began business in July, 1908. There is nothing in the present record which changes that conviction. But, however that may be, there certainly is no doubt that insolvency existed for four months prior to the filing of the petition in bankruptcy.

[5] III. This brings us to inquire whether the transfers sought to be recovered were made to defendant within the four-month period. That period began on October 15, 1909. It was subsequent to that date, as the trial court has correctly found, that the accounts were assigned by the bankrupt to Alexander. The proceeds of those accounts were paid into the Alexander collateral account between November 9, 1909, and February 14, 1910; and the defendant applied these proceeds to the payment of the bankrupt's indebtedness as follows: On January 12, 1910, $9,900; on February 14, 1910, $1,055.60; on March 2, 1910, $123.80; on March 11, 1910, $73.94; total, $11,153.34. But while the actual proceeds of these accounts were applied by the defendant

to the indebtedness of the bankrupt after October 15, 1909, the defendant insists that it obtained an equitable lien on the accounts on October 12, 1909, by the adoption of the resolution authorizing the assignment of the accounts. The resolution of October 12th authorized an assignment of the accounts to Alexander as collateral security for the indorsement of the renewals of certain notes to become due and discounted at defendant's bank. The claim is that whatever accounts were thereafter assigned in pursuance of this resolution to Alexander he took in trust for the defendant.

In Moses v. Murgatroyd, 1 Johns. Ch. (N. Y.) 119, 7 Am. Dec. 478 (1814), Chancellor Kent had before him a case where an assignment had been made "to be a security only to the intestate for his indorsement of the notes in question. "This being the case, the plaintiffs, as holders of the notes, are entitled," the Chancellor said, "to the benefit of this collateral security, given by their principal debtor to his surety; and the case of Maure v. Harrison, 1 Eq. Ab. 93, K, 5 Mich. 1692, is directly to this point. These collateral securities are, in fact, trusts created for the better protection of the debt; and it is the duty of this court to see that they fulfill the design. And whether the plaintiffs were apprised, at the time, of the creation of this security, is not material. The trust was created for their benefit, or for the better security of their debt, and when it came to their knowledge they were entitled to affirm the trust, and to enforce its performance. This was the principle assumed in the case of Neilson v. Blight, 1 Johns. Cas. [N. Y.] 205." And it is a settled rule in equity in New York that a creditor shall have the benefit of any collateral securities which the principal debtor has given to the surety for his indemnity. Such securities are regarded as trusts for the better security of the debt, and chancery will compel the execution of the trusts for the benefit of the creditor. Vail v. Foster, 4 N. Y. 312 (1850); National Bank of Newburgh v. Bigler, 83 N. Y. 51 (1880); Merchants', etc., Bank v. Cummings, 149 N. Y. 360, 44 N. E. 173 (1896). And the law of New York is the law of the states generally. See Brandt on Suretyship (3d Ed.) § 357 et. seq.

We are, however, unable to agree with counsel for defendant that it is immaterial when the actual assignment of the accounts occurred, and that the individual assignments date back to the agreements for the assignment as embodied in the resolution of October 12, 1909, by which the bankrupt became bound to assign the accounts. As the adoption of that resolution antedated by three days the four-month period, the defendant, it is asserted, cannot be compelled now to return any of the proceeds realized from those accounts. The resolution was not an assignment of the accounts, but an authorization of an assignment, and the agreement was with Alexander. When Alexander indorsed the notes, he had a right in equity to have the accounts assigned. The exhibits in the case show that after the adoption of this resolution the defendant accepted on October 19, 1909, a renewal note of the bankrupt for the amount of $4,998.24, and on the same date a second renewal note for the amount of $6,450.26, and also on that date a third renewal note for the amount of $4,000, and that each of these

notes were indorsed by Alexander. In the absence of evidence to the contrary, it may be assumed that Alexander indorsed the notes at the time of their renewal, and not on October 12, 1909, when the resolution was passed. And there were no notes renewed after the adoption of the resolution prior to the notes above mentioned.

In re Great Western Mfg. Co., 152 Fed. 123, 81 C. C. A. 341 (1907), the Court of Appeals in the Eighth Circuit held that a transfer of property by an insolvent debtor within four months of a filing of a petition in bankruptcy against him, which otherwise constitutes a voidable preference, is not deprived of that character or made valid by the fact that it was executed in performance of a contract to do so made more than four months before the filing of the petition. The matter was very fully considered in that case. The court said:

"Any other course of decision opens a new and enticing way to secure preferences, nullifies every provision of the law to prevent them, and invites fraud and perjury. Hold that transfers within four months in performance of agreements to make them before that time do not constitute voidable preferences, and honest debtors would agree with their favored creditors before the four months that they would subsequently secure them by mortgages or transfers of their property, and just before the petitions in bankruptcy were filed they would perform their agreements. Dishonest men, who made no such contracts, might falsely testify that they had done so, and thus by fraud and perjury sustain preferential transfers and mortgages made within the four months to relatives or friends. The great body of the creditors would be left without share in the property of their debtor and without remedy, and a law conceived and enacted to secure a fair and equal distribution of the property of debtors among their creditors would fail to accomplish one of its chief objects. This court will hesitate long before it approves a rule so fatal to the most salutary provisions of the Bankruptcy Law."

And this court in Re Mandel, 135 Fed. 1021, 68 C. C. A. 546 (1905), had reached the same conclusion, affirming without opinion a decision to that effect in (D. C.) 127 Fed. 863 (1903). A like decision has been made by the Court of Appeals in the Fourth Circuit in Pollock v. Jones, 124 Fed. 163, 61 C. C. A. 555 (1903). In that case at the time the debt was incurred the debtor promised to give a mortgage to secure it. The court held that the subsequent giving of the mortgage when the debtor was insolvent and within four months of his bankruptcy constituted a transfer of property to secure an antecedent debt and created a preference. In Wilson v. Nelson, 183 U. S. 191, 22 Sup. Ct. 74, 46 L. Ed. 147 (1901), the debtor had given an irrevocable power of attorney to the creditor to confess judgment many years before. Judgment was confessed under it within four months, and the Supreme Court held it to be a voidable preference. There is therefore no escape from the conclusion that within the four-month period the defendant received from the assigned accounts $10,950 to apply on the bankrupt's indebtedness, and the farther sum of $4,266.90 from the proceeds of the discount of drafts and notes given for the merchandise of the bankrupt sold about January 17, 1910.

[6] IV. That the effect of the payments or transfers received by the defendant in the manner above stated and after October 15, 1909, enabled it to obtain a greater percentage of its debt than other creditors of the same class is so clearly established upon the record that

discussion of the matter is really unnecessary. The president of the defendant testified that its debt had been paid in full. "All the indebtedness," he said, "owing to the bank on notes or whatever indebtedness was owing by the O. L. Gregory Vinegar Company has been paid." The amount paid during four months prior to the filing of the petition has been already considered. It only remains to point out in this connection that with the exception of the Robertsons who conducted a private bank at Tonawanda the general creditors have received nothing and there remains an unpaid indebtedness of $41,909.52, with no assets whatever to discharge it, except such amounts as the trustee, in this suit and in the independent suit brought against the Robertsons, may recover from preferential payments.

[7] V. This brings us to inquire whether in receiving the payments defendant had reasonable cause to believe that they were intended to give a preference. The record discloses that the president of the defendant bank had an intimate knowledge of the bankrupt's affairs from the time it began business. The bankrupt did its banking with defendant. Its president knew that it bought its property for $30,000 and paid only $5,000 down. He knew that the mortgage remained unpaid, and that the indebtedness to the defendant was gradually increasing until on January 15, 1909, it amounted to $41,000. In September, 1909, the defendant declined to loan the bankrupt money to buy apples for the fall grinding. The president of the defendant bank knew that the bankrupt did no grinding that fall. He knew it was simply selling off the cider and vinegar that remained over from the previous season. All the time the defendant was pressing for the payment of its indebtedness and was having accounts assigned to it that they might be applied when collected on the debt. He knew also that drafts drawn by the bankrupt had gone to protest and were lying unpaid in his bank; and he knew that notes of the bankrupt were being protested and left to lie for days in his bank unattended to. If the defendant did not know of the insolvency, it certainly knew enough to put it upon inquiry.

[8] As the Court of Appeals for the Eighth Circuit said in Coder v. McPherson, 152 Fed. 951, 82 C. C. A. 99 (1907):

"Notice of facts which would incite a man of ordinary prudence to an inquiry under similar circumstances is notice of all the facts which a reasonably diligent inquiry would disclose."

This was quoted approvingly in an opinion of this court written by Judge Coxe in Wright v. Skinner, 162 Fed. 315, 89 C. C. A. 23 (1908). See Pittsburgh Plate Glass Co. v. Edwards, 148 Fed. 377, 78 C. C. A. 191 (1906). No principle of law is better settled or more universally accepted.

We think that under all the circumstances of this case the conclusion is irresistible that defendant knew or had reasonable cause to know that in receiving the payments made to it between October 15, 1909, and February 15, 1910, it was receiving a preference. In Grandison v. Robertson we thought that the defendants in that case did not have reasonable cause to believe that a preference was intended or would result from the payments made to them. But the defendant in the

case at bar was very differently situated from the defendant in that case and knew much more intimately than did. those defendants the entire situation concerning the bankrupt's affairs.

The defendant claims that it loaned the bankrupt $5,000 on November 6, 1909. Swanton testified that he loaned the bankrupt that amount on that date. The evidence stands uncontradicted, and indeed appears to be corroborated by certain documentary evidence. It appears, however, that a payment of $3,950 on the renewal note for this $5,000 was paid on January 12, 1910. That payment was made out of the proceeds of accounts assigned directly to defendant prior to the four-month period, and is not claimed as preferential, nor included in the decree as entered. The balance of the note, $1,050, was paid from the proceeds of accounts assigned to Alexander and is held to have been preferential. The defendant cannot set off this sum, or any part of it, against the amount the trustee is entitled to recover. Bankruptcy Act, § 60c (Comp. St. 1913, § 9644), provides:

"If a creditor has been preferred, and afterwards in good faith gives the debtor further credit without security of any kind for property which becomes a part of the debtor's estate, the amount of such new credit remaining unpaid at the time of the adjudication in bankruptcy may be set off against the amount which would otherwise be recoverable from him."

To obtain the set-off under the above provision the credit must have been given in "good faith." If the purpose of advancing this $5,000 was to enable the bankrupt to convert juice into cider and vinegar and market the same, we cannot say that the loan was not made in good faith. The Supreme Court said in Kaufman v. Tredway, 195 U. S. 271, 275, 25 Sup. Ct. 33, 34, 49 L. Ed. 190 (1904), that the clause as to good faith "meant that the creditor should not act in such a way as to intentionally defeat the bankrupt act, but should let the debtor have the money or property for some honest purpose." The money was not given with a view to its secretion or for a dishonest purpose.

But the right to offset a new credit given in good faith is restricted to the amount of the new credit remaining unpaid at the time of the adjudication. See Remington on Bankruptcy (2d Ed.) § 1416. And at the time of the adjudication no part of this new credit as we have seen remained unpaid.

We do not find it necessary to pass upon other objections raised. We find no reversible error.

Decree affirmed.