In re BAUMGARTNER.

NATIONAL BOND & INVESTMENT CO. v. SCHMIDT.

PARK SAV. BANK v. SAME.

Nos. 4520, 4521.

Circuit Court of Appeals, Seventh Circuit.
Dec. 11, 1931.

Rehearing Denied March 18, 1932.

John W. Creekmur and D. E. Hoopingarner, both of Chicago, Ill., and Quarles, Spence & Quarles, of Milwaukee, Wis., for appellant National Bond & Investment Co.

R. S. Witte and John Schlintz, both of Milwaukee, Wis. (Gerald C. Maloney, of Milwaukee, Wis., of counsel), for appellant Park Sav. Bank.

Nathan M. Stein, of Milwaukee, Wis. (L. L. Rieselbach, of Milwaukee, Wis., of counsel), for appellee.

Before ALSCHULER and SPARKS, Circuit Judges, and WOODWARD, District Judge.

SPARKS, Circuit Judge (after stating the facts as above).

Under the above statement of facts each appellant claims that it is entitled to receive from the trustee the proceeds now in his hands received from the sale of the automobiles in controversy. On the other hand, the trustee claims that the Company is not entitled to recover the proceeds of the Densky car because the purported mortgage assigned to the Company by bankrupt is a forgery, and the car covered by that mortgage has not been sufficiently identified as the same car which was sold, and the proceeds of which are now in the hands of the trustee. As to the other cars, the trustee claims that the purported bills of sale from bankrupt to the Company are not in fact bills of sale, but, under the laws of Wisconsin, are to be construed as chattel mortgages; and, on account of not having been filed with the city clerk of Milwaukee with-

in the time prescribed by statute, they are invalid except as between bankrupt and the Company.

By reason of these facts, it is trustee's contention that the seizure of the automobiles by the Company constituted an unlawful preferential transfer of bankrupt's assets.

As to the Bank, the trustee contends: (1) That the Bank's mortgage constitutes an unlawful preference because of the fact that the mortgage was given for a past-due debt within four months previous to the petition in bankruptcy; (2) that at the time of the execution of Bank's mortgage, and for a long time prior thereto, bankrupt was insolvent, of which fact the Bank had knowledge, or had reasonable cause to believe it; and (3) that Bank's mortgages were of the usual form, with no provision for sales thereunder, and that possession was in bankrupt, and cars were permitted by Bank to be sold in the usual course of business and the proceeds diverted into his bank account and checked out by him in the ordinary course of business.

Inasmuch as appellants' rights, if any, to the property in controversy are based upon contracts made in Wisconsin, and those rights are claimed to have matured prior to the adjudication in bankruptcy, the law of Wisconsin must therefore be applied in determining those rights at and prior to the adjudication in bankruptcy, for the adjudication added nothing to the rights of either appellant. In re Goorman (D. C.) 283 F. 119; In re Cohn (D. C.) 171 F. 568.

In 4 Remington on Bankruptcy (3d Ed.) 70, § 1405, it is said: "However, after the State law has once settled the nature of the transaction, once determined whether the facts are sufficient to constitute a transfer of title, and, if so, the time the transfer takes effect and the property affected thereby, then the Bankrupt Act may forthwith step in and declare whether it is a voidable preference or a nullified legal lien." When the bankrupt law deals with property rights which are regulated by the state law, the federal courts in bankruptcy will follow the state courts. Board of Trade of City of Chicago v. Johnson, 264 U. S. 1, 44 S. Ct. 232, 68 L. Ed. 533.

It is therefore necessary (1) to determine from the laws of Wisconsin what rights, if any, other than as a general creditor, either appellant had in the property in controversy at the time of the adjudication in bankruptcy; and (2) to apply the applicable provisions of the Bankruptcy Act (11 USCA) to the facts as fixed by that determination.

The Company's arguments on the matters presented are based quite largely upon its assumption that the instrument of transfer executed by bankrupt to Rothschild, and by him assigned to the Company, was a conditional sales contract, and the authorities cited by it in support of its right to recover are largely, if not entirely, those wherein the instruments in controversy were admittedly conditional sales contracts. We are, however, unable to accept that characterization of the instruments upon which the Company relies, and we think the District Court was right in holding that such instruments, in view of the surrounding circumstances, were chattel mortgages. The ruling seems to be unquestionably supported by Holak v. Southard, 182 Wis. 494, 196 N. W. 769, Salter v. Bank of Eau Claire, 97 Wis. 84, 72 N. W. 352, Blue v. Herkimer Nat. Bank (C. C. A.) 30 F.(2d) 256, Keystone Finance Corp. v. Krueger (C. C. A.) 17 F.(2d) 904, and In re Goorman, supra.

The Company insists, however, that the transaction between Rothschild and bankrupt did not constitute a loan because there was no agreement on the part of bankrupt to repay the money. With this construction we cannot agree, for each time bankrupt received money from Rothschild he (bankrupt) accepted a ninety-day draft for the exact amount, which of course meant that he would pay that amount to Rothschild when due. But the Company says this was to be regarded not as payment of a debt, but as consideration for the repurchase of the cars by bankrupt. This position seems to us to be quite inconsistent. If the transaction was a simple purchase and sale, we are unable to understand why Rothschild or the Company required bankrupt to pay interest to him on the consideration which Rothschild had, as he said, paid to bankrupt, but which the resident manager of the Company said was paid by the Company. It will be noted that the drafts which were accepted by bankrupt at the times he received the respective amounts of money drew interest and collection charges from date of acceptance. It is unusual, to say the least, in cases of sales for the grantor to pay interest to the purchaser on the consideration which the grantor has received from the purchaser; but payment of interest is one of the strongest characteristics of a loan.

That the transaction was a mere loan, and intended as such by the parties, is to our minds conclusively proved by that part of the so-called "resale and repurchase" agreement which provides that in case bankrupt sells a car for cash (and under the agreement he was not permitted to sell it for less than the amount which Rothschild claims he had paid bankrupt for it), bankrupt was required immediately to transmit to Rothschild, not what Rothschild had paid for that car, but the entire proceeds of such sale, and this amount was to be applied *upon all indebtedness* then due from bankrupt to Rothschild. If the original transaction was a mere purchase and sale, what other indebtedness was there due, in case of a sale of a car by bankrupt before the due date of the draft for that car, except the price which it is claimed Rothschild paid for that particular car? In case of delinquency or insolvency the instruments provided that all drafts are to be considered as due without notice; but, regardless of these contingencies, the repurchase agreement provides that, in all events where bankrupt sells a car to a customer for cash, the entire proceeds of that sale, which of course includes dealer's profit, are to be remitted to Rothschild and applied *upon all indebtedness* then due Rothschild from bankrupt.

We think it is obvious from the language referred to that the Company and Rothschild in fact considered as a loan all the money which was advanced to bankrupt on the cars in controversy, and that they attempted to secure to the Company the right to apply the entire proceeds of any sale by bankrupt, if it so desired, to the reduction of the entire amount of such indebtedness. The use of the word *"upon,"* in the phrase "upon all indebtedness," indicates clearly that the Company and Rothschild thought the purchase price paid by the customer for a car would not be sufficient to pay all indebtedness owing to it by bankrupt, although, according to the agreement, such price had to be at least equal to the amount of money which the Company or Rothschild had advanced on that particular car. Of course bankrupt was to pay interest on the draft, but it is fair to presume that bankrupt's profit would more than take care of that item, and in such event the remaining profit was to be applied upon all other indebtedness due the Company from bankrupt, which we think referred to the total amount advanced by Rothschild or the Company to bankrupt on all the cars so handled. We are convinced that the instrument in controversy, denominated as a bill of sale by the Company, was nothing more or less than a chattel mortgage, which, not having been recorded as required by the Wisconsin statute, is not valid as against the Bank, whose mortgage was recorded. Wisconsin Stat. 1929, §§ 241.08 and 241.10; First Nat. Bank v. Biederman, 149 Wis. 8, 134 N. W. 1132, Ann. Cas. 1913C, 837; Holak v. Southard, supra; Southern Wis. Acceptance Co. v. Paull, 192 Wis. 548, 213 N. W. 317.

■■ It is contended by the Company, however, that inasmuch as it took possession of all the cars except the Densky car before the adjudication of bankruptcy, its title to those cars became complete as against all parties. This contention presupposes the fact that the instruments executed by bankrupt to Rothschild placed the title to the cars in the Company; but inasmuch as we hold that they constitute in fact chattel mortgages, and were never recorded, the contention of the Company in this respect must fail, because the Bank had subsequently taken a chattel mortgage from bankrupt and had filed it pursuant to Wisconsin Statutes 1929, § 241.08.[2] Where a subsequent chattel mortgage is given, whether the second mortgagee has notice or not, the second mortgage, if recorded, or if possession is taken thereunder, precedes the prior unrecorded mortgage. First Nat. Bank v. Biederman, supra; Holak v. Southard, supra; Southern Wis. Acceptance Co. v. Paull, supra. The Company therefore had no right to take possession of the cars, and its act in so doing did not strengthen its title, but it amounted to an unlawful preference. Waterman v. Hantke, 190 Wis. 1, 207 N. W. 946, 208 N. W. 992; First Nat. Bank v. Staake, 202 U. S. 141, 26 S. Ct. 580, 50 L. Ed. 967; Grandison v. Nat. Bank of Commerce (C. C. A.) 231 F. 800.

The authority of York Mfg. Co. v. Cassell, 201 U. S. 344, 26 S. Ct. 481, 50 L. Ed. 782, and kindred cases, to the effect that the reduction of collateral to possession prior to bankruptcy under an instrument of security deprives the trustee of any interest, is not applicable where rights have intervened, such as in the instant case.

As to the Densky car, it is admitted that the mortgage thereon, which bankrupt as-

---

[2] "No mortgage of personal property shall be valid against any other person than the parties thereto unless the possession of the mortgaged property be delivered to and retained by the mortgagee or unless the mortgage or a copy thereof be filed as provided in section 241.10, except when otherwise directed in these statutes. * * *" Wisconsin Stat. 1929, § 241.08.

signed to the Company, was a forgery, and of course it passed no title.

■ It is contended, however, by the Company that the Bank's chattel mortgage is fraudulent and void under the Wisconsin statutes. This contention cannot prevail, because only creditors armed with process by virtue of which the property has been seized are in a position to raise the question of whether or not the mortgage is valid or invalid. Holt v. Crucible Steel Co., 224 U. S. 262, 32 S. Ct. 414, 56 L. Ed. 756; Detroit Trust Co. v. Pontiac Savings Bank, 237 U. S. 186, 35 S. Ct. 509, 59 L. Ed. 907; Sawyer v. Turpin, 91 U. S. 114, 23 L. Ed. 235; Graham v. Perry, 200 Wis. 211, 228 N. W. 135, 68 A. L. R. 267. In view of the fact that we hold that the Company's unrecorded chattel mortgage is invalid, and that its seizure of the property was unlawful, it is not such a creditor as the above decisions contemplate. Its security having been nullified, its relationship with bankrupt becomes that of debtor and unsecured general creditor, regardless of the fraud which bankrupt undoubtedly committed (Cunningham v. Brown, 265 U. S. 1, 44 S. Ct. 424, 68 L. Ed. 873); and this is true whether the obligation of bankrupt arises out of tort or contract. Clingman v. Miller (C. C. A.) 160 F. 326.

■ The trustee in bankruptcy succeeds to the rights of all or any creditors. Fourth St. Nat. Bank v. Millbourne Mills Co.'s Trustee (C. C. A.) 172 F. 177, 30 L. R. A. (N. S.) 552; 11 USCA § 75 (a) (2); Sparks v. Kuss, 195 Wis. 378, 216 N. W. 929, 935, 218 N. W. 208. He may, in his own name and for the benefit of the estate, prosecute the remedy of any one creditor who may be prevented by the bankruptcy proceedings from commencing or continuing his action. 11 USCA §§ 107 (b), 110 (e); In re New York Economical Printing Co. (C. C. A.) 110 F. 514; Hetherington & Sons, Ltd. v. Rudisill (C. C. A.) 28 F.(2d) 713, 62 A. L. R. 377; Stellwagen v. Clum, 245 U. S. 605, 38 S. Ct. 215, 62 L. Ed. 507. He is not only the trustee under the special provisions of the Bankruptcy Act, but his title and right are as that of the bankrupt, and as the ideal "creditor armed with process." Sparks v. Kuss, supra. An execution returned unsatisfied, as in an ordinary proceeding in equity, is not a prerequisite to the right of action of the trustee; but in the exercise of that right he may file a bill to avoid any transfer by the bankrupt of his property, which any creditor

might have avoided had bankruptcy not intervened. Riggs v. Price, 277 Mo. 333, 210 S. W. 420; Mueller v. Bruss, 112 Wis. 406, 88 N. W. 229; Fourth St. Nat. Bank v. Millbourne Mills Co., supra; Stellwagen v. Clum, supra.

"Whenever a creditor is prevented from enforcing his rights as against a lien created, or attempted to be created, by his debtor, who afterwards becomes a bankrupt, the trustee of the estate of such bankrupt shall be subrogated to and may enforce such rights of such creditor for the benefit of the estate." Bankruptcy Act 1898, § 67b, 11 USCA § 107 (b).

The court said in In re New York Economical Printing Co. (C. C. A.) 110 F. 514, 518: "Subdivision 'b,' § 67 (Act of 1898), preserves for the benefit of the estate in bankruptcy a right which some particular creditor has been prevented from enforcing by the intervention of the debtor's bankruptcy. If a creditor, by an execution or a creditors' bill, has secured a legal or equitable lien upon the mortgaged property before the mortgagor has been adjudicated a bankrupt, under this provision his rights will or will not inure to the benefit of the estate, depending upon the time when the lien was acquired. If acquired more than four months before the commencement of the bankruptcy proceeding, his lien would inure to his own exclusive benefit; but, if acquired at any time within the four months, it would be null and void, under subdivision 'f' of the section, except as preserved for the benefit of the estate as provided in that subdivision and in subdivision 'b.'" See, also, Hetherington & Son, Ltd. v. Rudisill (C. C. A.) 28 F.(2d) 713, 62 A. L. R. 377.

This section has also been construed to give the trustee in bankruptcy a right of action to recover property transferred in violation of state law. Stellwagen v. Clum, supra.

Under the authorities we are convinced that the trustee in bankruptcy succeeds to all the rights of the Bank as well as all other creditors, and as between trustee and the Company the trustee must prevail. First Nat. Bank v. Staake, supra.

We are next confronted with the contentions of Bank with relation to the validity of its mortgage. It denies the fraud charged against it by trustee, and says that it admits its mortgage did not permit sales by bankrupt of the property covered thereby, and denies that it gave bankrupt permission to sell such property. It further claims that

at the time its mortgage was executed it had no knowledge of the insolvency of bankrupt, and says that there was no reasonable cause for it to believe that fact, or to believe that its mortgage would effect a preference.

There was evidence to the effect that bankrupt, before he absconded, was carrying on the business of selling automobiles, during which time he exhibited cars in his salesroom. All mortgages given by him to the Bank covered the cars on exhibition at the respective times the several mortgages were executed. An officer of the Bank testified that no cars were ever taken from the exhibition floor unless the Bank knew about it; that bankrupt would come to the Bank and tell them that he had a deal and ask permission to take the cars off the floor or to sell them, and the Bank would consent; that when such cars were sold bankrupt would inform Bank when new cars came in to replace the ones sold, and when the new cars were placed on the exhibition floor an officer of the Bank went there, checked the numbers of the cars on the floor, and searched for prior liens at the city clerk's office, but never found any such liens. The officer then returned to the Bank and prepared the new mortgage and renewal note, and bankrupt would afterwards come in and sign it.

The first mortgage given on March 6, 1929, covered nine Peerless cars. None of these cars, with perhaps the exception of the Densky car, were covered by the last mortgage. There were other cars listed in the intervening mortgages executed by bankrupt to the Bank which were not included in the last mortgage, but the record does not disclose how many.

The original note called for $9,500. By May 11, 1929, the amount owing on the note was $8,700; and at some time prior to November 12, 1929—but the record does not disclose when—the amount of the note was reduced by payments to $7,300. From these facts it is obvious that of the nine cars in the first mortgage, which were considered by Bank as ample security for the payment of $9,500, together with the unknown number of other cars included in the other mortgages executed by bankrupt to Bank prior to November 12, 1929, at least eight were sold by bankrupt and taken from the floor, and of the amount received from the sale thereof only $2,200, or an average of $275 a car, was applied on Bank's mortgage debt.

█ If we assume that the nine cars in the first mortgage were in fact ample security for the loan of $9,500 and were perhaps sold by bankrupt for not less than that amount, then bankrupt received from the sale of the eight cars an average of approximately $1,055, and of this amount $780 a car was not applied on the mortgage debt, but, according to the testimony of Bank's assistant cashier, was deposited with the Bank to the account of bankrupt and by him checked out in the regular course of his business. The conclusive inference from such a course of business is that there was an implied or tacit agreement between the Bank and bankrupt that mortgagor was to be at liberty to sell and dispose of the mortgaged cars and apply the major portion of the proceeds to his own use. Such an implied agreement is as effective for that purpose as if it were express. Charles Baumbach Co. v. Hobkirk, 104 Wis. 488, 80 N. W. 740. A mortgage which permits the mortgagor to remain in possession of the mortgaged property, and to sell it and apply the proceeds, partially or wholly, to his private use is void as to creditors. Durr v. Wildish, 108 Wis. 401, 84 N. W. 437. Where property is mortgaged to one creditor to secure his demand, good faith to other creditors requires that if such property be sold the proceeds shall be applied to the payment of the mortgage debt. Bank of Kaukauna v. Joannes, 98 Wis. 321, 73 N. W. 997; Southern Wis. Acceptance Co. v. Paull, supra; Ross v. State Bank of Trego, 198 Wis. 335, 224 N. W. 114, 73 A. L. R. 225; Caroline State Bank v. Andrews (Wis.) 235 N. W. 794.

█ None of the cars covered by the last mortgage were sold, and the Bank contends that the principle of law laid down in the authorities last cited are not applicable to it. But it must be conceded, we think, that all preceding mortgages, by virtue of that principle, are invalid as to creditors. This being true, Bank's contention in this respect cannot prevail, because Bank's mortgage was executed within four months previous to the adjudication in bankruptcy, and the debt secured by it was contracted more than eight months prior to the execution of the last mortgage and would ordinarily be considered as a pre-existing debt. These facts would necessarily classify the last mortgage as an unlawful preference, unless it is validated by the fact that it is a mere renewal of a preceding mortgage with substituted security. To accomplish this there must be a substitution of security simultaneously with the release of the previous security. Wolfe v. Bank of Anderson, (C. C. A.) 238 F. 343. It may be true that in each case when a new mortgage was executed the preceding

one was simultaneously released of record; but whenever bankrupt sold a car to a customer by consent of Bank, the Bank thereby released such car as security and waived its lien thereon just as effectively as if it had then released it of record. Southern Wis. Acceptance Co. v. Paull, supra. We are convinced, therefore, that the method employed in the disposition of cars and the taking of another mortgage on the new cars when they arrived cannot be considered such simultaneity of action as is contemplated by the authorities. The mortgages preceding the last one being void as to creditors, there was no valid existing preceding mortgage of which the last one can be considered a renewal, and the last mortgage must therefore be regarded as securing a pre-existing unsecured indebtedness; and, being executed within four months previous to petition in bankruptcy, it is void as to creditors, and the property therein described inures to the trustee.

That bankrupt was insolvent at the time of the execution of the last mortgage we have no doubt, and we think the methods employed by him in the conduct of his business were sufficient to authorize the District Court in so finding.

We also feel sure that the Bank had reasonable cause to know of bankrupt's insolvency, and to believe at the time of the execution of its mortgage that a preference in its favor would thereby be effected. The character of bankrupt's business, the method of its conduct, the relationship existing between the Bank and bankrupt, the opportunities to acquire knowledge both of bankrupt and his dealings with the Company, are sufficient, under all the circumstances, to support the finding of the District Court that there was legal fraud on the part of appellants and bankrupt as against the other creditors.

The order of the District Court is affirmed.