## CUNNINGHAM, TRUSTEE OF PONZI, *v.* BROWN ET AL.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE
FIRST CIRCUIT.

No. 213.   Argued March 12, 1924.—Decided April 28, 1924.

1. Where a person obtained money by fraudulent representations from
   many others upon his time notes for the amounts borrowed and fifty
   per cent., but, to stimulate public confidence, gave it out that he
   would return the amount borrowed on any note at any time
   before its maturity and pursued that practice, *held,* that lenders
   who took advantage of this offer and secured repayment shortly
   before his bankruptcy, when they had reason to believe him in-
   solvent, were not thereby rescinding their contracts for the fraud
   and reclaiming their own funds, but were creditors equally with the
   others who filed their claims for reimbursement in the bankruptcy
   proceedings; and that the repayments thus made were illegal pref-
   erences recoverable by the bankrupt's trustees.   P. 10.
2. Facts *held* to sustain a finding that parties obtaining repayments
   had reason to believe the payor insolvent.   *Id.*
3. Where the funds of a bankrupt consisted entirely of money bor-
   rowed from many persons by fraud, a lender who rescinded and
   secured repayment out of the same bank account in which his and
   other like loans were deposited by the  bankrupt, could not justify
   the repayment, against the charge of illegal preference, upon the
   theory of a resulting trust, or lien, if the repayment was made after
   the account had been exhausted by payments to other lenders and
   after it had been replenished by the bankrupt with other portions
   of the borrowed funds.   P. 11.

1

4. In such a situation, the ruling in *Clayton's Case,* 1 Merivale, 572, that defrauded claimants were entitled to be paid inversely to the order in which their moneys went into a common fund, has no application; and likewise the ruling in *Knatchbull* v. *Hallett,* L. R. 13 Ch. D. 696, that where a fund is composed partly of a defrauded claimant's money and partly of that of the wrongdoer, it will be presumed that, in the fluctuations of the fund, it was the wrongdoer's purpose to draw out first the money to which he was honestly entitled, and that the claimant may assert an equitable lien on the residue.   P. 12.

5. A minor is not exempt from defeat of an unlawful preference under § 60b of the Bankruptcy Act.   P. 13.

284 Fed. 936, reversed.

CERTIORARI to review decrees of the Circuit Court of Appeals affirming decrees of the District Court which dismissed the bills in six suits, brought by the trustees of a bankrupt, under § 60b of the Bankruptcy Act, to recover payments made by the bankrupt, upon the ground that they were unlawful preferences.

*Mr. Edward F. McClennen,* with whom *Mr. William R. Sears* and *Mr. Clarence M. Gordon* were on the brief, for petitioner.

*Mr. John H. Devine,* with whom *Mr. Walter A. Buie, Mr. Edward A. Counihan, Jr.,* and *Mr. Joseph P. Dexter* were on the brief, for Crockford, Murphy and Holbrook, respondents.

The fraud in these cases consisted in Ponzi's receiving the respondent's money when he was hopelessly insolvent, he knowing the fact and concealing his condition from the respondents, innocent depositors.   *In re Stewart,* 178 Fed. 463, and cases there cited.

When the respondents' money was thus obtained, it was impressed with a trust for their benefit which attached to the general fund with which Ponzi's moneys were mingled, and this trust followed that fund so long as the trust moneys were not exhausted.   *In re Stewart,*

*supra; Cheney* v. *Dickinson,* 172 Fed. 109; *Friend* v. *Talcott,* 228 U. S. 27; *St. Louis & San Francisco Ry. Co.* v. *Johnston,* 133 U. S. 566; *In re Hamilton Carpet Co.,* 117 Fed. 774; *In re Gold,* 210 Fed. 410.

The respondents would have the right to have their money back even if Ponzi had not deposited the identical money he received from them but had substituted other moneys belonging to himself. *National Bank* v. *Insurance Co.,* 104 U. S. 54.

In these cases, however, it is clear and undisputed that the very moneys of which Ponzi defrauded the respondents were deposited by him in the Hanover Trust Company and that the checks they received and cashed were drawn upon his account in that bank.

The right of the respondents to recover their property cannot be impaired by the trustee. *Bussing* v. *Rice,* 2 Cush. 48; *Cf. Tiffany* v. *Boatman's Institution,* 18 Wall. 375; *Goodwin* v. *Massachusetts Loan Co.,* 152 Mass. 189. See also *Peoples National Bank* v. *Mulholland,* 228 Mass. 152; *Watchmaker* v. *Barnes,* 259 Fed. 783.

Respondents were not creditors. *Richardson* v. *Shaw,* 209 U. S. 365; *Donaldson* v. *Farwell,* 93 U. S. 631.

Ponzi stood to them in a relation of a trustee *ex maleficio.* Pomeroy's Eq. Juris., 2d ed., § 1053.

The respondents never submitted themselves to the jurisdiction of the bankruptcy court, and the money which they received was not impressed with any lien or trust in favor of the trustees in bankruptcy.

If the respondents were never creditors of Ponzi's estate in bankruptcy, but merely *cestuis que trustent,* their taking back their moneys out of Ponzi's hands in no manner diminished his estate.

Indeed, it seems from all the evidence that until the election of some of Ponzi's customers to prove their claims in bankruptcy, there was no property in the estate upon which the bankruptcy court could lay hold. Until then,

all the property Ponzi had consisted of trust money.  Certainly the bankrupt's estate was not diminished by the payments to the respondents.

There can be no preference without a depletion of the bankrupt's estate.  *In re Schwab,* 258 Fed. 772.  See *Gorman* v. *Littlefield,* 229 U. S. 19; Bankruptcy Act, as amended June 25, 1910, § 60 (a) and (b); *Putnam* v. *United Trust Co.,* 223 Mass. 199; *Rogers* v. *American Halibut Co.,* 216 Mass. 227.

The only evidence on which the petitioner can rely to establish that the respondents had reasonable cause to believe a preference would be effected, is the newspaper report.  That the respondents, or any of them, saw that report is purely conjectural.  *Rogers* v. *American Halibut Co., supra.*

The following cases, although decided before the amendment of 1910 to the Bankruptcy Act, seem to be in point upon the question as to what constitutes reasonable cause to believe that the debtor was insolvent and that a preference would be effected by payment to the creditors.  *Grant* v. *National Bank,* 97 U. S. 80; *In re First National Bank of Louisville,* 155 Fed. 100; *Curtiss* v. *Kingman,* 159 Fed. 880; *Tumlin* v. *Bryan,* 165 Fed. 166.

The burden was on the trustees.  *Importers & Traders National Bank* v. *Peters,* 123 N. Y. 272; *National Bank* v. *Insurance Co.,* 104 U. S. 54; *Southern Cotton Oil Co.* v. *Elliotte,* 218 Fed. 567; *In re Mulligan,* 116 Fed. 715; *Ellicott* v. *Kuhl,* 16 N. J. Eq. 333; *Hewitt* v. *Hayes,* 205 Mass. 356; *Smith* v. *Mottley,* 150 Fed. 266; *Ryder* v. *Hathaway,* 21 Pick. 298; *Tumlin* v. *Bryan,* 165 Fed. 166; *In re Leech,* 171 Fed. 622; *Turner* v. *Schaeffer,* 249 Fed. 654.

*Mr. Louis Goldberg* for Brown, respondent.

The trustees must show by a preponderance of proof, that the money transferred was the property of Ponzi,

and that there thereby was consummated a depletion of the funds available for general creditors. The presumption is, where money charged with a trust *ex maleficio* is mingled with the general funds of the debtor, that the debtor first exhausts his own before paying out trust funds.

The defendant having exercised his right to rescind, the money was his own property, and he could maintain his title against all persons except one receiving it for value *bona fide* without notice. *Atwood* v. *Dearborn,* 1 Allen, 483; *National Bank* v. *Insurance Co.,* 104 U. S. 54; *Bussing* v. *Rice,* 2 Cush. 48; *Tiffany* v. *Boatman's Institution,* 18 Wall. 375; *Goodwin* v. *Massachusetts Loan Co.,* 152 Mass. 189; *Peoples National Bank* v. *Mulholland,* 228 Mass. 152; *Watchmaker* v. *Barnes,* 259 Fed. 783.

Having received back his own property, Brown is not a creditor, and consequently the transfer did not operate to diminish the bankrupt's estate. *Hewitt* v. *Hayes,* 205 Mass. 356.

The suit of the plaintiff lacks the ground of liability that the person receiving the transfer had reasonable ground for believing that preference had been made.

The rescinding party has merely exercised the right of reclamation. Consequently he is chargeable with no knowledge as to his relative rights as against persons who, as against him, have no rights at all.

Granted that the defendant Brown had reasonable cause to believe that Ponzi was insolvent, and that he, Brown, had obtained a greater proportion than those who proved their claims in bankruptcy, this does not show reasonable cause to believe that a preference has been made.

This case, as dealing with a preference, is not a bankruptcy case proper. Loveland, Bankruptcy, 4th ed., § 541; *Pond* v. *New York Exchange Bank,* 124 Fed. 992; Bankruptcy Act, § 60b.

This not being a strictly federal question, the District Court and the Circuit Court of Appeals will give effect to the common law of Massachusetts, the State in which the alleged preference was made. This fundamental principle is ignored by the petitioners, who in effect ask this Court to overrule the decision of the Circuit Court of Appeals for the First Circuit in *Empire State Surety Co.* v. *Carrol County*, 194 Fed. 593.

*Clayton's Case*, 1 Merivale, 572, is inapplicable. *Hewitt* v. *Hayes*, 205 Mass. 356; *Empire State Surety Co.* v. *Carrol County, supra. In re Mulligan*, 116 Fed. 715, distinguished. See *Knatchbull* v. *Hallett*, 13 Ch. Div. 696; *National Bank* v. *Insurance Co.*, 104 U. S. 54.

The main issue becomes a moot question as to the infant defendant, Brown. *MacGreal* v. *Taylor*, 167 U. S. 688; *Knudson* v. *General Motorcycle Co.*, 230 Mass. 54; *Jacobs* v. *Saperstein*, 225 Mass. 300; *Rogers* v. *American Halibut Co.*, 216 Mass. 227; *Hewitt* v. *Boston Straw Board Co.*, 214 Mass. 260; *Cohen* v. *Small*, 120 App. Div. 211; *Reber* v. *Ellis Bros.*, 185 Fed. 313.

To repeat, a preference suit is not a bankruptcy proceeding. The statute merely lays down the terms on which the right of action is predicated, leaving the rest to the substantive law of the forum. *Christopher* v. *Norvell*, 201 U. S. 216, distinguished.

By demanding and receiving his money back, Brown was only exercising his right of rescission as a minor, under the age of twenty-one; and therefore no transfer was effected.

It is obvious that the dealings between Ponzi and Brown amounted to a contract, and a contract not for necessaries.

A contract of this nature the defendant had a legal right to cancel at any time during his minority, and a reasonable time thereafter.

Brown avoided the contract by withdrawing his money, thus leaving all the parties concerned in the same status

as if there had been no transaction at all. This is based on the theory that the contracts of minors are voidable until avoided.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

These were six suits in equity brought by the trustees in bankruptcy of Charles Ponzi to recover of the defendants sums paid them by the bankrupt within four months prior to the filing of the petition in bankruptcy, on the ground that they were unlawful perferences. All the trustees have died or resigned pending the litigation, and Cunningham, having been substituted for the last survivor, is now the sole trustee. The actions were tried together in the District Court, and were argued together in the Circuit Court of Appeals, and all the bills were dismissed in both courts. The facts and defenses are the same in all the cases, except that, in that of Benjamin Brown, there was an additional defense that he was a minor when the transactions occurred. We have brought the cases into this Court by writ of certiorari.

The litigation grows out of the remarkable criminal financial career of Charles Ponzi. In December, 1919, with a capital of $150, he began the business of borrowing money on his promissory notes. He did not profess to receive money for investment for account of the lender. He borrowed the money on his credit only. He spread the false tale that on his own account he was engaged in buying international postal coupons in foreign countries and selling them in other countries at 100 per cent. profit, and that this was made possible by the excessive differences in the rates of exchange following the war. He was willing, he said, to give others the opportunity to share with him this profit. By a written promise in ninety days to pay them $150 for every $100 loaned, he induced thousands to lend him. He stimulated their avidity by

paying his ninety-day notes in full at the end of forty-five days, and by circulating the notice that he would pay any unmatured note presented in less than forty-five days at 100% of the loan. Within eight months he took in $9,582,000 for which he issued his notes for $14,374,000. He paid his agents a commission of 10 per cent. With the 50 per cent. promised to lenders, every loan paid in full with the profit would cost him 60 per cent. He was always insolvent and became daily more so, the more his business succeeded. He made no investments of any kind, so that all the money he had at any time was solely the result of loans by his dupes.

The defendants made payments to Ponzi as follows:

| | |
|---|---:|
| Benjamin Brown, July 20th | $600 |
| Benjamin Brown, July 24th | 600 |
| H. W. Crockford, July 24th | 1,000 |
| Patrick W. Horan, July 24th | 1,600 |
| Frank W. Murphy, July 22nd | 600 |
| Thomas Powers, July 24th | 500 |
| H. P. Holbrook, July 22nd | 1,000 |

By July 1st, Ponzi was taking in about one million dollars a week. Because of an investigation by public authority, Ponzi ceased selling notes on July 26th, but offered and continued to pay all unmatured notes for the amount originally paid in, and all matured notes which had run forty-five days, in full. The report of the investigation caused a run on Ponzi's Boston office by investors seeking payment and this developed into a wild scramble when, on August 2nd, a Boston newspaper, most widely circulated, declared Ponzi to be hopelessly insolvent, with a full description of the situation written by one of his recent employees. To meet this emergency, Ponzi concentrated all his available money from other banks in Boston and New England in the Hanover Trust Company, a banking concern in Boston, which had been his chief depository. There was no evidence of any gen-

eral attempt by holders of unmatured notes to secure payment prior to the run which set in after the investigation July 26th.

The money of the defendants was paid by them between July 20th and July 24th and was deposited in the Hanover Trust Company. At the opening of business July 19th, the balance of Ponzi's deposit accounts at the Hanover Trust Company was $334,000. At the close of business July 24th it was $871,000. This sum was exhausted by withdrawals of July 26th of $572,000, of July 27th of $288,000, and of July 28th of $905,000, or a total of more than $1,765,000. In spite of this, the account continued to show a credit balance because new deposits from other banks were made by Ponzi. It was finally ended by an overdraft on August 9th of $331,000. The petition in bankruptcy was then filed. The total withdrawals from July 19th to August 10th were $6,692,000. The claims which have been filed against the bankrupt estate are for the money lent and not for the 150 per cent. promised.

Both courts held that the defendants had rescinded their contracts of loan for fraud and that they were entitled to a return of their money, that other dupes of Ponzi who filed claims in bankruptcy must be held not to have rescinded, but to have remained creditors, so that what the latter had paid in was the property of Ponzi, that the presumption was that a wrongdoing trustee first withdrew his own money from a fund mingled with that of his *cestui que trustent,* and therefore that the respective deposits of the defendants were still in the bank and available for return to them in rescission, and that payments to them of these amounts were not preferences but merely the return of their own money.

We do not agree with the courts below. The outstanding facts are not really in dispute. It is only in the interpretation of those facts that our difference of view arises.

In the first place, we do not agree that the action of the defendants constituted a rescission for fraud and a restoration of the money lent on that ground. As early as April, his secretary testifies, Ponzi adopted the practice of permitting any who did not wish to leave his money for forty-five days to receive it back in full without interest, and this was announced from time to time. Two of the defendants expressly testified to this. It was reiterated in the public press in July and by the investigating public authorities. There is no evidence that these defendants were consciously rescinding a contract for fraud. Certainly Ponzi was not returning their money on any admission of fraud. The lenders merely took advantage of his agreement to pay his unmatured notes at par of the actual loan. Such notes were paid under his agreement exactly as his notes which were matured were paid at par and 50 per cent. The real transaction between him and those who were seeking him is shown by the fact that there were five hundred to whom he gave checks in compliance with his promise and who were defeated merely because there were no more funds.

The District Court found that when these defendants were paid on and after August 2nd, they had reason to believe that Ponzi was insolvent. The statute, § 60b of the Bankruptcy Act, as amended June 25, 1910, c. 412, 36 Stat. 838, 842, requires that, in order that a preference should be avoided, its beneficiary must have reasonable cause to believe that the payment to him will effect a preference, that is that the effect of the payment will be to enable him to obtain a greater percentage of his debt than others of the creditors of the insolvent of the same class. The requirement is fully satisfied by the evidence in this case, no matter where the burden of proof. On the morning of August 2nd, when news of Ponzi's insolvency was broadly announced, there was a scramble and

a race. The neighborhood of the Hanover Bank was crowded with people trying to get their money and for eight days they struggled. Why? Because they feared that they would be left only with claims against the insolvent debtor. In other words, they were seeking a preference by their diligence. Thus they came into the teeth of the Bankrupt Act and their preferences in payment are avoided by it.

But even if we assume that the payment of these unmatured notes was not according to the contract with Ponzi and that what the defendants here did was a rescission for fraud, we do not find them in any better case. They had one of two remedies to make them whole. They could have followed the money wherever they could trace it and have asserted possession of it on the ground that there was a resulting trust in their favor, or they could have established a lien for what was due them in any particular fund of which he had made it a part. These things they could do without violating any statutory rule against preference in bankruptcy, because they then would have been endeavoring to get their own money, and not money in the estate of the bankrupt. But to succeed they must trace the money and therein they have failed. It is clear that all the money deposited by these defendants was withdrawn from deposit some days before they applied for and received payment of their unmatured notes. It is true that by the payment into the account of money coming from other banks and directly from other dupes the bank account as such was prevented from being exhausted; but it is impossible to trace into the Hanover deposit of Ponzi after August 1st, from which defendants' checks were paid, the money which they paid him into that account before July 26th. There was, therefore, no money coming from them upon which a constructive trust, or an equitable lien could be fastened. *Schuyler* v. *Littlefield,* 232 U. S. 707; *In re*

*Mulligan,* 116 Fed. 715; *In re Matthews' Sons,* 238 Fed. 785; *In re Stenning* (1895), 2 Ch. 433. In such a case, the defrauded lender becomes merely a creditor to the extent of his loss and a payment to him by the bankrupt within the prescribed period of four months is a preference. *Clarke* v. *Rogers,* 228 U. S. 534; *In re Dorr,* 196 Fed. 292; *In re Kearney,* 167 Fed. 995.

Lord Chancellor Eldon, in *Clayton's Case* (1816 Ch.), 1 Merivale, 572, held that, in a fund in which were mingled the moneys of several defrauded claimants insufficient to satisfy them all, the first withdrawals were to be charged against the first deposits and the claimants were entitled to be paid in the inverse order in which their moneys went into the account. Ponzi's withdrawals from his account with the Hanover Trust Company on July 26, 27 and 28, were made before defendants had indicated any purpose to rescind. Ponzi then had a defeasible title to the money he had received from them and could legally withdraw it. By the end of July 28th, he had done so and had exhausted all that was traceable to their deposits. The rule in *Clayton's Case* has no application.

The courts below relied on the rule established by the English Court of Appeals in *Knatchbull* v. *Hallett,* L. R. 13 Ch. D. 696, in which it was decided by Sir George Jessel, Master of the Rolls, and one of his colleagues, that where a fund was composed partly of a defrauded claimant's money and partly of that of the wrongdoer, it would be presumed that in the fluctuations of the fund it was the wrongdoer's purpose to draw out the money he could legally and honestly use rather than that of the claimant, and that the claimant might identify what remained as his *res* and assert his right to it by way of an equitable lien on the whole fund, or a proper *pro rata* share of it. *National Bank* v. *Insurance Co.,* 104 U. S. 54, 68; *Hewitt* v. *Hayes,* 205 Mass. 356. To make the rule applicable here, we must infer that in the deposit and withdrawal

of more than three millions of dollars between the deposits of the defendants prior to July 28th, and the payment of their checks after August 2nd, Ponzi kept the money of defendants on deposit intact and paid out only his subsequent deposits. Considering the fact that all this money was the result of fraud upon all his dupes, it would be running the fiction of *Knatchbull* v. *Hallett* into the ground to apply it here. The rule is useful to work out equity between a wrongdoer and a victim; but when the fund with which the wrongdoer is dealing is wholly made up of the fruits of the frauds perpetrated against a myriad of victims, the case is different. To say that, as between equally innocent victims, the wrongdoer, having defeasible title to the whole fund, must be presumed to have distinguished in advance between the money of those who were about to rescind and those who were not, would be carrying the fiction to a fantastic conclusion.

After August 2nd, the victims of Ponzi were not to be divided into two classes, those who rescinded for fraud and those who were relying on his contract to pay them. They were all of one class, actuated by the same purpose to save themselves from the effect of Ponzi's insolvency. Whether they sought to rescind, or sought to get their money as by the terms of the contract, they were, in their inability to identify their payments, creditors and nothing more. It is a case the circumstances of which call strongly for the principle that equality is equity, and this is the spirit of the bankrupt law. Those who were successful in the race of diligence violated not only its spirit but its letter and secured an unlawful preference.

We do not see that a minor whose money could not be identified is in a better situation than that of the other defendants. Like them, on August 2nd, he was only a creditor of Ponzi, and was moved to avoid insolvency by a preference just as they were. A minor is not exempt

from the defeat of an unlawful preference by § 60b of the Bankruptcy Act as amended.

*The decrees are reversed.*