296 F.2d 670
 Jerome FRIED and Nazareth Fairgrounds & Farmers Market,
Inc., Appellants,
v.
Benjamin MARGOLIS, Ida Mae Margolis, Sarah Kason, Bernard L.
Ungar and WilliamMck. Shongut, Appellees.
Arnold A. WEINSTEIN, Jerome Fried and Irving J. Wolf, et
al., Appellants,
v.
NAZARETH FAIRGROUNDS & FARMERS MARKET, INC., et al., Appellees.
 Nos. 415, 429, Docket 26962, 27000.
 United States Court of Appeals Second Circuit.
 Argued Aug. 17, 1961.
Decided Nov. 9, 1961.
 
 Alex L. Rosen, New York City, for appellant-appellee Nazareth Fairgrounds & Farmers Market, Inc.
 Harold Harper, New York City (Harper & Matthews, New York City, Vincent P. Uihlein, New York City, of counsel), for appellant Jerome Fried.
 Armende Lesser, New York City, for appellee William McK. Shongut.
 Arnold A. Weinstein, New York City, pro se.
 Melvin Lloyd Robbins, New York City, for appellants Wolf and others.
 Leonard Franklin, New York City, for appellees Herbert Danciger and Melvin S. Danciger.
 Before MOORE, FRIENDLY and SMITH, Circuit Judges.
 MOORE, Circuit Judge.
 
 
 1
 The two cases (Nos. 26962 and 27000) consolidated on this appeal both involve the resolution of stock claims in Nazareth Fairgrounds & Farmers Market, Inc. (the Debtor), a corporation being reorganized under Chapter X of the Bankruptcy Act, 11 U.S.C.A. 501 et seq. No. 26962 involves five stock claimants (54 shares) and is an appeal from an order of the District Court which reopened the proceedings on a petition to review a decision of the Referee denying the stock claims of the five claimants therein. No. 27000 is an appeal from an order of the District Court settling and allowing the stock claims of the thirty-six claimants (262 shares) therein.
 
 
 2
 The Debtor was organized on August 7, 1951, as part of a plan to transfer the ownership of a farmers' market in Nazareth, Pennsylvania, a parcel of some 32 acres and buildings, from a group consisting of Edward Malakoff, Maurice Malakoff, Milton Zoloth and Morris Soble (the Philadelphia Group) to John Malakoff (Malakoff). Prior thereto on April 17, 1951, the Philadelphia Group through a controlled corporation, Richard Realty Co., purchased this property from its then owner, Nazareth Fairgrounds, Inc., for $66,000. John Malakoff had one-quarter interest in the original purchase of the property by the Philadelphia Group. On May 14, 1951, for corporate and tax reasons Richard Realty Co. conveyed the property subject to mortgages to Kipling Realty Co. (also a Philadelphia Group controlled corporation) for $100.
 
 
 3
 In July, 1951, John Malakoff orally agreed (so found by Examiner and trial court) to purchase the Philadelphia Group's interest in the property for $66,000 plus an undetermined amount, alleged to have been $30,000. The Articles of Incorporation of the Debtor which were executed on August 1, 1951, provided for an authorized capital of 200 shares with a stated capital applicable thereto of $120,000. The first meeting of the directors of the Debtor authorized the purchase of the Nazareth property from Zoloth and Soble for twenty shares of the corporation's stock and the assumption of all obligations by the corporation, including amounts shown as loans payable to the Philadelphia Group. About August 8, 1951, stock certificate #1 for 10 shares was issued to Milton Zoloth and certificate #2 for 10 shares was issued to Morris Soble. On October 17, 1951, a contract was executed between John Malakoff and Zoloth and Soble whereby Malakoff purchased their 20 shares of stock for $32,853.08;. $2,853.08 was paid on execution of the contract and the remaining $30,000 was to be paid in 10 monthly installments of $3,000. Title to the stock was to pass on the execution of the contract but the stock was to be held in escrow until the payment of the $30,000. On October 17, 1951, Zoloth, endorsed stock certificate #1 over to Malakoff and on October 22, 1951, Soble endorsed certificate #2 to Malakoff. On June 17, 1953, Malakoff endorsed these certificates over to the Debtor, and executed a release of all claims against the Debtor.
 
 
 4
 The certificates and corporate books were not turned over to Malakoff until December, 1952, although he had been managing the business since October, 1951.
 
 
 5
 In April, 1951, Malakoff started to solicit investments in the Nazareth enterprise, promising investors a 20% return on their capital. Generally, shares were offered at a rate of $1,000 a share, although some investors paid only $600 a share.
 
 
 6
 Between April 1, 1951, and February 15, 1952, Malakoff received from investors in the Nazareth venture $79,025 and paid to the Philadelphia Group $77,010.84; the latter figure includes $11,032.84 received in payment of an insurance claim for windstorm damage. However, at no time did the amount that John Malakoff paid to the Philadelphia Group exceed the amount which he had already collected from investors. Until he became insolvent in June, 1953, Malakoff paid monthly 'dividends' to the investors based on a 20% annual return on their original investments. These 'dividends' were paid in Ponzi-like[1] manner out of new money received from investors in the Nazareth Market. The corporation did not have a profit from which dividends could have been paid during this period. Shares of stock were issued to the claimants herein on and after February 2, 1953, and none can be said to have been issued in a regular manner, that is, upon receipt of consideration passing directly to the Debtor. Moreover, the consideration for which the stock in Nazareth was issued was not the same in all cases: some investors gave Malakoff cash or checks; others received their interest in Nazareth by releasing funds which Malakoff held for them as proceeds from other ventures; others accepted Nazareth stock from Malakoff in exchange for stock in other Malakoff ventures that had proved worthless; and some of the claimants received interests in Nazareth in satisfaction of Malakoff's personal debts to them. In substantially all cases the certificates were not issued to the stock claimants at or about the time they allegedly gave consideration to Malakoff as an investment in Nazareth. Altogether 316 shares were issued, 116 more than were authorized, to the 41 claimants herein. On September 28, 1953, the Debtor filed a voluntary petition for reorganization under Chapter X of the Bankruptcy Act. To achieve a reorganization of the Debtor which, insofar as stock issuance and ownership are concerned, never had been properly organized, the trial court had to determine as a basic issue: who, if any, were entitled to participate in the stock of the reorganized Debtor. The Court referred the task of making this investigation to an Examiner (Bankruptcy Act of 1898, 167, 168; 11 U.S.C.A. 567, 568). Testimony (some 10,000 pages) was taken concerning the circumstances under which the stock claimants had purportedly invested in the Nazareth Market or claimed to be entitled to participate as stockholders of the Debtor. In a detailed and painstaking report (236 pages), the Examiner carefully sifted the issues fundamental to the resolution of stock participation.
 
 
 7
 In summary, he found that every claimant had acquired his or her stock by means of transactions with Malakoff or his agents; that none of the consideration therefor passed directly to the Debtor; that Malakoff and the claimants 'ascribed little or no importance to the legal form which the venture took, or to the observance of the legal and other formalities and requisites of its corporate form'; that not one of the claimants 'has a clear legal right to any of the shares which he or she claims'; and that he (the Examiner) should 'apply equitable principles in the determination of who are the stockholders of the debtor and what proportions of its stock they hold.'
 
 
 8
 Since the problem for the reorganization court is to decide upon the capitalization necessary to do equity in the light of the various claims before it, this court need pass only upon the immediate question of who should be stockholders of the reorganized debtor and in what proportions. With these basic principles determined, the solution becomes more clearly defined. One group of investors paid Malakoff by check, credit or cash various sums to purchase an interest in the Nazareth Market. The money was solicited for this purpose by Malakoff as the promoter of the enterprise and was not intended to be loans to Malakoff personally or to be used generally by him in his many business operations. The funds should have reached the Debtor's treasury and have been the consideration required by Pennsylvania law[2] to support the valid issuance of the Debtor's shares. The other group consists of persons to whom Malakoff issued shares for antecedent personal debts, in exchange or substitution for shares of other ventures or for other obligations personal to Malakoff. From these persons the Debtor did not receive and was not intended to receive anything of value, either from them or from Malakoff. These shares as a matter of Pennsylvania law could have had no validity as an original issue. In many instances, however, Malakoff gave by assignment to persons in this group shares purportedly issued to him. Had these shares been validly issued to Malakoff then, but only then, would the principles of the Uniform Stock Transfer Act[3] in force in Pennsylvania at the time of the transactions here involved as to consideration and 'value' apply. But no such shares were ever validly issued to Malakoff. The 20 shares originally issued to Zoloth and Soble, although subsequently assigned to Malakoff and still later by him to the Debtor, did not come into the hands of any claimant. After the shares had been issued to the claimants from and after February 2, 1953, corporate minutes in May or June, 1953, were fraudulently prepared and pre-dated as of July 2, 1952 (or post-dated as of July 2, 1953) purporting to evidence the issuance of the remaining 180 shares to Malakoff for $75 a share. There is no proof that Malakoff ever paid for these shares or that they were legally issued. Thus no claimant can derive any rights by assignment from Malakoff on the theory that he was the owner of the Debtor's stock. The purported issuance was both fraudulent and invalid.
 
 
 9
 Despite the cloud of illegality obscuring any stock issuance, the Debtor came into corporate being and did acquire a valuable property which it still holds. The Market property is sufficient to support a valid stock issue to those entitled thereto. The sellers (Philadelphia group) have been paid for that property by Malakoff. Malakoff in turn obtained the money for this purpose from those who thought that they were to receive an interest in the Nazareth Market. Malakoff as the promoter must be regarded as a trustee, fiduciary, agent, promoter or syndicator (the terminology is unimportant-- the facts create the rights) for those who gave him their funds for investment in the project. They should in equity receive that for which they paid.
 
 
 10
 Although the findings of fact of the Examiner may be accepted almost in their entirety, his conclusions are at variance with the equitable principles applicable here. The Examiner treated Malakoff as the owner and operator of the Debtor and each claimant as having purchased his interest from Malakoff. This erroneous assumption made it possible for the Examiner to accept the stock claims of all claimants who had received stock from Malakoff on the theory that stock transfers from Malakoff rested upon adequate consideration if the Stock Transfer Act's definition of 'value' were satisfied. This, however, is not the problem. The Debtor's stock for all practical purposes has never been legally issued. Such stock as is to be issued in the reorganization should be based upon the requirements of Pennsylvania law with respect to the issuance of stock.[4]
 
 
 11
 Malakoff received the moneys put into his hands by the investors for the specific purpose of the allotment of shares in the Nazareth Market property. He used some of this money to acquire that property. Title thereto now is in the Debtor. The court upon reorganization is in a position to give to the investors that which they were originally entitled to receive.
 
 
 12
 At the time Malakoff obtained the investors' funds, he spoke in terms of the issuance of shares. To some he promised shares at $600; to others at $1,000. Although shares were purportedly issued, the 'dividends' of 20% were paid and accepted on the basis of the amount invested. Greater equity will be achieved by calculating the allowed claims in terms of dollars rather than in invalidly issued shares. The 'investors' had a right to expect that the sums delivered to Malakoff would represent their shares in the enterprise and would be delivered to the corporation. Therefore, in determining their interests the entire amount paid, undiminished by any so-called 'dividends,' must control their participation.
 
 
 13
 As to the stock claimants, with few exceptions they fall into two distinct categories: (1) those investors who paid for a participation in the Nazareth Market by cash, check or credit, and (2) those who did not make any payment but who rely upon antecedent indebtedness of Malakoff and other transactions with him unrelated to the Nazareth venture as consideration.
 
 
 14
 In the first category are the claimants listed below whose claims should be allowed in the amounts indicated. As to these claimants, the findings of the Examiner and the trial court relating to the amounts paid to Malakoff and the circumstances under which they were paid are affirmed.
 
 
 15
 Name Amount
Charles Kanter .......... $ 4,000.00
Morton Samet .............. 2,000.00
Gertrude Klein ........... 14,000.00
Dorothy Holober Clark ..... 3,000.00
Barry Clark ............... 4,000.00
Harold Q. Masur ........... 4,000.00
Louis Como ................ 6,000.00
Frank Como ................ 6,000.00
Patsy Como ................ 8,000.00
Anne Bikales .............. 5,000.00
Lawrence Treat ............ 2,000.00
Dorothy Kane .............. 3,000.00
Miriam Klein .............. 3,350.00
Ruth Spielholz ............ 3,000.00
Mae Bluestone ............. 2,000.00
Gussie Schwartz ........... 2,000.00
Harold B. Schwartz ........ 4,000.00
Lazar Karapantso .......... 2,000.00
Ernest Pollak ............. 9,000.00
H. Lawrence Laupheimer .... 7,750.00
Arnold A. Weinstein ....... 7,000.00
Aaron Fried ............... 3,000.00
George Bond ............... 1,000.00
Tess J. Schwartz .......... 3,000.00
Cydney Grosman ............ 2,000.00
Rose Kaplan ............... 1,000.00
Robert A. Noire ........... 5,000.00
Richard S. Hull ........... 3,600.00
Leslie Saul ............... 3,000.00
Jerome Fried .............. 2,000.00
Ann Rosen ................. 6,000.00
 Charles Kanter
 
 
 16
 As to the claimant, Kanter, there must be some modification of the Examiner's and trial court's conclusions. The Examiner found that after Malakoff in early 1951 had agreed to take a one-quarter interest in the Nazareth Market for $16,000, Kanter took one-quarter of this amount for $4,000 and gave Malakoff a check for $2,667 and cash or customers' checks for $1,333.33. Although Malakoff's promissory note for $4,000, dated April 11, 1951, signed as 'Agent,' is somewhat in conflict with the investment theory, nevertheless it is endorsed 'For 1/16th of interest in Nazareth Market.' Therefore, $4,000 may properly be placed in the investment category. The balance of Kanter's claim falls into the second category and must be disallowed.
 
 
 17
 In the second category are the claims which must be disallowed.
 
 Herbert and Melvin Danciger
 
 18
 The Dancigers' claim is based upon a certificate for 11 shares given to them by Malakoff to secure a personal obligation arising out of a real estate operation unrelated to the Nazareth Market. The entire claim must be disallowed.
 
 Seymour Forman
 
 19
 This claim to 15 shares is based upon a certificate for 15 shares issued in Malakoff's name and endorsed by him to Forman. Even this claimant does not contend that he intended to invest in Nazareth. At most, the shares (invalidly issued) were to secure loans. If Forman has a claim based upon a loan for $5,000, or any other amount, to the Debtor, it must be considered independently of any claim to a stock interest. The stock claim must be disallowed.
 
 Eskandar Manoochehrian
 
 20
 This claim is based upon two certificates totalling 20 shares. The claimant himself states the consideration to have been a loan of $20,000 to a corporation other than the Debtor. The claim clearly comes within the second category and must be disallowed in its entirety.
 
 H. Forman
 
 21
 The claim for 10 shares involves two certificates for 5 shares each dated March 13, 1953, and April 23, 1953, respectively. The Examiner found that 'At that time there were no open transactions between Forman and Malakoff and neither one owed the other any money'; that Forman delivered a check for $5,000 dated April 23, 1953, payable to Malakoff to cover Forman's agreement to buy 5 shares in the Nazareth project; that 'It is perfectly plain that the transaction Forman had with Malakoff on or about the 17th day of March, 1953, was a security transaction so far as the Nazareth stock was concerned'; and that the second certificate 'likewise seems to have been a security transaction despite Forman's testimony to the contrary.' The April, 1953, payment of $5,000 for 5 shares is claimed to have been for an investment in Nazareth. However, the Examiner has found to the contrary on conflicting evidence and no showing has been made that such a finding is clearly erroneous. As a result, these facts place this claim in the second category and it must be disallowed.
 
 Frederick Katzenell
 
 22
 Katzenell bases his claim upon an alleged Malakoff antecedent indebtedness of $28,000 and a $2,000 check given to Malakoff in September, 1951. The check, however, bears Katzenell's own notation of 'loan.' Neither the antecedent debt nor the loan support an investment in Nazareth and, hence, his claim must be disallowed.
 
 
 23
 Another group (the Margolis group) involved in a separate appeal (No. 26962) must be considered as potential participants. The Referee in Bankruptcy found no equity in favor of any claimant in this group, i.e., Benjamin Margolis (17 shares), William McK. Shongut (10 shares), Bernard Ungar (2 shares), Ida Margolis (15 shares) and Sarah Kason (10 shares).
 
 
 24
 Despite the fact that the Margolis appeal relates directly only to the district court's order permitting a reopening of the proceedings as to this group, there is sufficient proof before this court to enable us to indicate our views as to the rights of these claimants.
 
 
 25
 The claims of three of the five claimants in appeal No. 26962, Benjamin Margolis, Bernard Ungar and Sarah Kason, should be completely disallowed. These claims are based on certificates which were issued in satisfaction of Malakoff's personal debts or to replace worthless stock in other Malakoff ventures. The claims of William McK. Shongut and Ida Margolis should be allowed in part.
 
 Benjamin Margolis
 
 26
 Benjamin Margolis claimed 17 shares, purchased in units of 10 and 9 (2 of the latter group were sold to claimant Ungar). For the former group, the consideration was debts owed personally by Malakoff to Mr. and Mrs. Margolis. For the latter, Margolis turned over shares in Wales Properties, Inc. (another Malakoff venture), specifically found by the Referee to be worthless. All of Margolis's claims should, therefore, be denied.
 
 Bernard Ungar
 
 27
 Ungar gave Margolis $2,000 for two shares of Margolis's stock. Since this stock was never validly issues to Margolis, Ungar could obtain no better rights thereto. His only remedy is agbainst Margolis.
 
 Sarah Kason
 
 28
 Sarah Kason, Ida Margolis's mother, held 10 shares. The Referee found that these shares were issued as security for money previously loaned to Malakoff personally by Ida Margolis, despite the fact that Mrs. Margolis claims the loans to have been to Nazareth. This finding appears reasonable and, therefore, the Kason claim should be deinied.
 
 William Mck. Shongut
 
 29
 Shongut's 10 shares were acquired pursuant to an alleged agreement with Margolis whereby he delivered to Margolis, as attorney, his check for $10,000. Margolis deposited this check in his bank account and Margolis guaranteed Shongut an income on the stock of 20% a year for 6 years. Shongut actually had given this $10,000 to Margolis for investment in Nazareth. However, Margolis only gave by checks and cash $6,287.34 to Malakoff. Shongut, therefore, should be followed $6,287.34; for the rest he must look to Margolis.
 
 Ida Margolis
 
 30
 In 1951 Ida Margolis paid to Malakoff $9,000 for 15 shares. This amount should be treated in the same manner as the allowed claims in appeal No. 27,000. The remainder of her claim, however, is based on stock issued to her in payment of a personal debt of Malakoff and, therefore, must be disallowed.
 
 
 31
 All Margolis group claims should be disallowed except those of Ida Margolis for $9,000 and Shongut for $6,287.34, which should be allowed.
 
 
 32
 There remains for consideration the proper treatment which should be accorded the 'dividend' payments. Moneys paid by investors, which should have been turned over to Debtor but were diverted to persons whose stock claims are disallowed, belonged in equity to the Debtor. However, the rights of the Debtor with respect to such recoupment, if any, as may be just and proper, are not within the issues on this appeal. Insofar as 'dividend' payments were made to and received by claimants whose claims are allowed, the sums were obviously not dividends because there were no earnings to support such payments. They could therefore only be regarded as distributions out of the Debtor's capital. The amounts received as found by the trial court should be a charge against any distributions to be made to these stockholders and any shares issued upon reorganization so endorsed or stamped as to indicate this liability to subsequent purchasers or transferees.
 
 
 33
 This opinion deals with the rights of the original recipients of Nazareth stock. There have been some transfers, including those noted in Docket No. 26,362 decided simultaneously herewith, dealing with certain purchases and sales by claimants, Weinstein and J. Fried. The conclusions in this opinion are without prejudice to such action as equitable principles may require with respect to these two claimants or others who have bought or sold stock.
 
 
 34
 Appellants' contention in No. 26,962 that the district court could not open the petition for review and receive new evidence, including the minutes of the hearings on the stock claims involved in appeal No. 27,000, is without merit. General Order No. 47, 11 U.S.C.A. following section 53, gives the district court the right to receive further evidence after receipt of a referee's report.[5] The necessity for such a rule is demonstrated by the facts presented in this case. The Referee's decision, that none of the claimants could recover because none of them gave consideration which passed directly to the corporation, was wrong. In order to make an equitable determination of the claims presented by these five claimants, the district court deemed it necessary (probably for comparative purposes) to consider the factual basis for the allowance of the claims of the other claimants. In view of our disposition of the claims in Docket No. 27,000 and our views as to the claims in Docket No. 26,962 further evidence beyond that already available to the court would seem to be unnecessary.
 
 
 35
 This reorganization has been pending for over eight years. The Farmers Market appears to be a currently profitable operation. A rapid termination of the proceeding would be in the interest of the claimants and the courts, thus giving to those who some ten years ago thought that they were investing in the Market that which they should have received at the time.
 
 
 36
 The order in #27,000 is reversed except as specified in this opinion. The order in #26,962 is affirmed as to reception of so much of the minutes as does not concern evidence peculiar to the claimants in #27,000; otherwise, reversed. On the petitions to review the order of the Referee in Bankruptcy, the district court is directed to modify the order of October 5, 1957, in accordance with this opinion. No costs in Dockets #27,000 and #26,962.
 
 
 
 [1]
 See Cunningham v. Brown, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924)
 
 
 [2]
 'No corporation shall issue stocks or bonds except for money, labor done, or money or property actually received; and all fictitious increase of stock or indebtedness shall be void.' Pa.Const. art. XVI, 7, P.S., implemented in 15 Purdon's Pa.Stat. 2852-603, subd. A (1958)
 
 
 [3]
 "Value' is any consideration sufficient to support a simple contract. An antecedent or pre-existing obligation, whether for money or not, constitutes value where a certificate is taken either in satisfaction or as security therefor.' Uniform Stock Transfer Act 22(1), 15 Purdon's Pa.Stat. 322, now covered by Uniform Commercial Code 8-303, 12A Purdon's Pa.Stat. 8-303 (1958)
 
 
 [4]
 See footnote '2,' supra
 
 
 [5]
 In the Matter of Kaufhold, 3rd Cir., 1958, 256 F.2d 181; Powell v. Wumkes, 3rd Cir., 1942, 142 F.2d 4