**SOUTHMARK CORPORATION,**
Plaintiff–Appellee,

v.

Jeffrey CAGAN and Cagan Realty, Inc., as Court–Appointed Receiver for Equity Builders Incorporated and Riviera Utilities of Arkansas, Inc., Defendants–Appellants.

No. 92–2542.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 25, 1993.

Decided July 8, 1993.

Rehearing and Suggestion for Rehearing In Banc Denied Aug. 19, 1993.

Arthur L. Klein, Hal R. Morris (argued), Michael R. Turoff, Carol L. McHugh, Arnstein & Lehr, Chicago, IL, for plaintiff-appellee.

Lawrence W. Schad, James Shedden, Beeler, Schad & Diamond, David A. Genelly (argued), Kenneth F. Berg, Fishman & Merrick, Chicago, IL, for defendants-appellants.

Before CUMMINGS and EASTERBROOK, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

CUMMINGS, Circuit Judge.

Little more than a year ago, we "strongly suggest[ed]" that this case, then before us on appeal from the denial of a motion to intervene, should be consolidated with two related cases in the district court. *Southmark Corp. v. Cagan*, 950 F.2d 416, 419 (7th Cir.1991). Our less than mandatory language failed to invoke the result we intended, however, and *Southmark* has come back to haunt us, once again in a form that does not resolve the merits of the underlying dispute.

On the surface, the structure of the present action is simple. Southmark sold a property known as Diamondhead to Equity Builders, Inc. When Equity's officers were sued in a related case, Jeffrey Cagan and Cagan Realty, Inc. (collectively "Cagan") were appointed as a receiver to represent Equity and Diamondhead's interests. In the present case, Southmark is suing Cagan and Equity to foreclose on the mortgage Southmark held to secure the Diamondhead sale.[1] In defense, Cagan asserts that this mortgage was part of a criminal pyramiding or "Ponzi"

scheme. He argues that Arkansas' fraudulent conveyance statute prevents Southmark from taking possession of Diamondhead because Southmark conspired to misappropriate money that belonged to Equity and partners who invested in Diamondhead. The district court granted summary judgment in favor of Southmark, finding that Equity was not injured by Southmark and that Cagan lacked standing to assert fraud claims against Southmark on behalf of the Diamondhead partnerships.

We reverse because significant factual issues bar Southmark from winning foreclosure of Diamondhead on summary judgment. The record does not disclose the mechanics of how the partnerships funded Equity's interest in Diamondhead, nor does it refute Cagan's charge that Southmark conspired with Equity's officers to divert Equity's income to Southmark. Until these issues are resolved, Southmark's foreclosure may not proceed. We order this case to be consolidated before Judge Grady with *Cagan v. Southmark Corp.*, No. 91 C 3720 (N.D.Ill.), where Cagan and the Diamondhead investors are suing Southmark for the same conduct they allege as affirmative defenses to foreclosure in today's case.

The facts underlying these conclusions are considerably more complicated than the simple foreclosure described above suggests.[2] In 1976, Kenneth Boula and Earl Dean Gordon formed an enterprise they dubbed "Financial Concepts." Billing themselves as investment advisors, Gordon and Boula solicited investors whom they organized into various limited partnerships. These limited partners then financed real estate purchases, and entities controlled by Gordon and Boula—corporate shells, it appears from our limited record—were general partners in each acquisition. In fact if not in form, Financial Concepts and Gordon and Boula controlled a web of real estate investments financed by disparate limited partnerships.

---

1. This summary describes the transaction's basic structure. Relevant details omitted here are discussed below.

2. Our account of the facts is drawn primarily from Cagan's appendix of pleadings and affidavits—appropriate, since Southmark won summary judgment—and in particular from the affidavit of Earl Dean Gordon, a principal actor in these events. D.App. 118–131. In this opinion, "P.App." refers to plaintiff's appendix, "D.App." to defendants' appendix.

Gordon and Boula assured their "clients" that the real estate projects, which often required management and development, would produce steady income. Whether by criminal malice or poor business acumen, however, properties Gordon and Boula relied on to solicit investors did not yield the promised returns, and the two began to pay earlier partnerships with money garnered from more recent ones. Gordon and Boula would attract investors by promising to develop a particular property, but instead of developing the property they would use the newly acquired money to finance other partnerships whose properties had not produced the required cash. It was a classic Ponzi scheme.[3]

In 1984, Gordon and Boula began to do business with Southmark, a Georgia corporation headquartered in Dallas that financed real estate developments by forming partnerships to supply the capital. Gordon arranged for Financial Concepts to become a licensed seller of Southmark partnerships, and in spring of 1985, the two companies signed a broker-dealer agreement. Over the next year, Financial Concepts sold $2.1 million of partnership interests for Southmark, a volume that earned Gordon and Boula bonuses and the designation "top producers."[4] Even as they earned kudos and cash on Southmark deals, however, Gordon and Boula knew that Financial Concepts needed much more income of its own to sate its partners' demands.

As Gordon tells the story, he and Boula thought Southmark's good graces could help extricate Financial Concepts from its cash-flow crisis. Gordon hoped Southmark might take over some or all of Financial Concepts' properties, and he met with a Southmark vice president in late 1985 to discuss his business problems. The vice president inspected Financial Concepts' books, and Gordon and Boula told him that they were financing older partnerships by soliciting new partners and telling the old partners that their real estate projects had generated the income. The Southmark vice president advised Gordon to consolidate his partnerships and deal with them through separate corporations, but had little else to offer. After this visit Gordon and Boula practiced business as usual until mid–1986, when the Illinois Attorney General barred Financial Concepts from selling real estate partnerships in Illinois—a setback Gordon claims to have communicated to Southmark. Gordon's affidavit suggests that Southmark knew early on exactly how Gordon and Boula did business, but looked the other way so that it could profit at the expense of investors in Financial Concepts.

Meanwhile, Southmark had bought Diamondhead, the property at issue in the present foreclosure action, for $1.7 million in 1984. Located in Hot Spring and Garland Counties, Arkansas, Diamondhead consisted of 1,000 lots, some undeveloped land, a small shopping building, a gas station and a water utility. In early 1987, the president of a Southmark division asked Gordon whether Financial Concepts would be interested in selling Diamondhead lots, and that spring Southmark told Gordon and Boula it was interested in selling Diamondhead outright. After negotiations, Gordon and Boula agreed to buy Diamondhead for $3.5 million on June 15, 1987. They set up a corporate shell called "Equity Builders, Inc." as their vehicle; Equity gave Southmark a note for the purchase price and Southmark took a mortgage on Diamondhead to secure the sale.[5]

3. *United States v. Boula*, 932 F.2d 651, 652 (7th Cir.1991), relates that Gordon and Boula pled guilty to mail fraud after their pyramid collapsed in 1988. Judge Wood explains at note 1 of *Boula* that Ponzi schemes are named after the swindler whose exploits are documented in *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924). More recently, *United States v. Boula*, 997 F.2d 263 (1993), reviews sentencing issues from Gordon's and Boula's convictions.

4. It is tempting to create our own "top producers" award for these two as well. To date, their exploits have generated four Seventh Circuit opinions—and no end is in sight.

5. The sale documents appear as Exhibits A–I to Southmark's first amended complaint, P.App. 36–77. They include two promissory notes, at 36–39; the mortgage, at 40–57; a stock purchase agreement and certificates, at 58–71; Equity's financing statement, at 72–73; and a mortgage assignment, at 74–77. A Southmark subsidiary was the seller; it assigned the mortgage to Southmark the same day the sale occurred. P.App. at 74–77. We omit discussion of "Riviera Utilities, Inc."—the company that held stock in

Viewing the facts in a light most favorable to Cagan, it appears that neither side undertook even rudimentary due diligence. Gordon and Boula, for example, took Southmark's word that Diamondhead was worth more than $3.5 million, when appraisals later revealed it was worth far less. Southmark represented that it had paid over $4 million for Diamondhead, when in fact it had paid $1.7 million. Gordon claims he thought he was getting a good deal on Diamondhead, but his own words provide an illuminating and alarming description of the sale's mechanics:

> I really did not totally care what price we paid for the property * * * because I figured Boula and I could, at least for the short term, finance the price by borrowing money from our private syndications as we had done in the past. It was my hope however in the long run, that I could sell lots in Diamondhead at a profit, and use the proceeds to get my partner and myself * * * out of the cash flow problems we [were] then awash in.

D.App. at 127. Southmark, for its part, did not investigate Gordon and Boula's financing, nor did it investigate the assets of Equity, the corporate shell that purchased Diamondhead. Gordon's affidavit suggests that Southmark knew he and Boula would raise the money to pay Southmark by soliciting partners to develop Diamondhead. Who was duping whom in this no-questions-asked deal? As receiver for Equity and Diamondhead, Cagan argues that Southmark and Gordon and Boula conspired to meet mutual short-term cash needs by defrauding Equity and the Diamondhead investors.

Equity paid $350,000 down for Diamondhead, which Gordon and Boula borrowed from banks. Between June of 1987 and March of 1988, Gordon and Boula formed nine partnerships and promised to use the participating partners' investments to develop lots at Diamondhead. These partnerships had names like "Diversified Income Associates" or "Diversified Shared Equity Income Associates" or "Diversified Growth Partners." D.App. at 65. They were not diversi-

fied, of course, and as it turned out they did not involve income or growth either. Gordon and Boula solicited $1.1 million from these Diamondhead partnerships; of this, $900,000 went "directly or indirectly" into Southmark's pockets, while Gordon and Boula kept the balance—a point on which the parties agree. D.App. at 66; P.Br. at 2. The record does not permit us to track the $900,000 with any precision. Gordon stated that he "took the money raised for [Diamondhead] partnerships and used it to repay the initial down payment * * * and the first installment payment of around $500,000 to Southmark." D.App. at 129. The record does not state whether any partnership funds passed through Equity en route to Southmark.

The bubble finally burst in 1988, when investors in Financial Concepts filed a securities fraud class action against Gordon and Boula. *Gaskill v. Gordon*, Nos. 88 C 3404 & 89 C 5232 (N.D.Ill.). Cagan was appointed receiver in July of 1988 to safeguard Financial Concepts' assets; the court ordered him to act as receiver for "any limited partnerships of which any defendant [*i.e.* Gordon, Boula or Financial Concepts entities] is a general partner." D.App. at 156. Diamondhead became receivership property in March of 1989 under an "Agreed Order" entered by Judge Williams in *Gaskill*. D.App. at 161. Cagan's accountant found that the Diamondhead partnerships were Financial Concepts entities, D.App. at 132–133, and thus Cagan is receiver for those partnerships in the present case as well. D.App. at 156. *Gaskill* settled before trial, and the investors won a judgment for $30 million in compensatory damages and $2 million in punitive damages. The record does not show whether any part of that award was paid to Diamondhead investors or indeed to anyone.

■ To summarize the procedural history of this case, Southmark's suit to foreclose on Diamondhead went before Judge Nordberg in the Northern District of Illinois. We upheld his denial of Diamondhead investors' efforts to intervene, reasoning that Cagan could protect the defrauded investors' inter-

the small utility that served Diamondhead—because this aspect of the transaction is irrelevant to today's opinion.

ests. *Southmark Corp. v. Cagan*, 950 F.2d 416, 419 (7th Cir.1991). We also urged that *Southmark* be consolidated with *Cagan v. Southmark Corp.*, No. 91 C 3720; before Judge Grady, where Cagan and the Diamondhead investors were suing Southmark for fraud. Judge Nordberg declined to consolidate *Cagan* and *Southmark* for reasons relating to creditor standing discussed below. Along the way Southmark went through bankruptcy in Texas; Judge Nordberg correctly found that Southmark's failure to give Cagan adequate notice in that action allows Cagan to press his claims in this suit even though those claims were not included in Southmark's court-approved reorganization plan.

■ Despite the complexity of the facts in this case, the legal issues are simple. On the one hand we have Southmark, which sold Diamondhead to Equity and now seeks to foreclose on its mortgage. Southmark argues that Cagan, as receiver, lacks standing to resist this foreclosure on behalf of the Diamondhead partners and Equity. On the other hand we have the Diamondhead partners, who cry "fraudulent conveyance" and assert that Southmark has already robbed them once (of their cash) and now has the gall to grab for the property it used to defraud them.

The district court's analysis began by stating a general rule that receivers may only bring actions that could be brought by the person whose property is in receivership—in this case, by Equity. The court noted that receivers also have standing to protect such property on behalf of creditors who have claims against it. This was a correct statement of Arkansas law. *Talbot v. Jansen*, 294 Ark. 537, 744 S.W.2d 723, 725 (1988). The court then reasoned as follows: Diamondhead partners had claims against Gordon and Boula but not against Equity; therefore those partners were not creditors of Equity; therefore Cagan could not resist Southmark's foreclosure action on the partners' behalf. The court also found that Equity was enriched by the alleged scheme between South-

mark, Gordon and Boula, and therefore Cagan could not bring counterclaims against Southmark on Equity's behalf. Having rejected Cagan's affirmative defenses to the Diamondhead foreclosure, the court granted summary judgment for Southmark. This analysis has two flaws that require us to reverse.

First, the trial court erred in finding that the Diamondhead partners are not Equity's creditors under traditional receivership law. The court's mistake here is rather simple: the Diamondhead partners are Equity's creditors as a matter of Arkansas law, under the definition of "creditors" supplied by the Arkansas fraudulent transfer statute. If the partners are creditors under that law, then they are creditors for purposes of receivership law as well, for Arkansas law creates the creditors' right of action that their receiver may then enforce. The fraudulent transfer statute defines a creditor as "a person who has a claim" and a claim as "a right to payment, whether * * * disputed, undisputed, legal, equitable [etc.] * * *." Ark.Code Ann. § 4–59–201(3)–(4). The critical question is whether the Diamondhead partners have any "claims" against Equity: if they do, they are "creditors" under the Arkansas statute, and Cagan has standing to pursue any relief that the statute affords.

■ Southmark relies on the affidavit of an accountant who audited Financial Concepts to argue that the Diamondhead partners cannot be Equity's creditors. The accountant stated:

EBI [Equity] was a shell corporation without assets until funded by the creditor partnerships. $1,350,760.00 was misappropriated by [sic][6] the partnerships to EBI which was never repaid. The prospectuses I examined indicate these investor funds were to be employed to construct rental real estate structures at Diamondhead. Instead, the funds were used to repay certain short term bank loans taken out by Boula and Gordon which were used to make payments on the Diamondhead purchase with Southmark.

6. We assume the accountant meant "from the partnerships;" "by" is inconsistent with the rest

of his affidavit. D.App. at 132–136.

D.App. at 133 (emphasis added). This affidavit was cited at oral argument to suggest that the Diamondhead partners gave money to Gordon and Boula or banks—but not to Equity, and hence that the partners could not be creditors of Equity. But the text above says no such thing. It says "funds were used" to repay bank loans, yet offers nothing as to *how*—who received the partners' money, who paid off the short-term loans. The affidavit is ambiguous on the question of whether partners wrote checks to Gordon and Boula, to a bank, or to Equity. It also says that Equity was "funded by" the partners, implying that the partners gave money to Equity which then paid off the short-term bank loans. In short, the accountant's affidavit says little about the financial relationship between Equity and the partners, and it certainly does not foreclose the possibility that the partners might have claims against Equity.

Cagan correctly argues that the Diamondhead partnerships have several claims that make them creditors under Arkansas' fraudulent transfer statute. They have a claim that Southmark conspired to loot Equity, supported by Gordon's account of the collusive and suspicious structure of the Diamondhead sale. They have a claim against Equity or Diamondhead for fraud as well because Equity and its officers led the partners to believe that they were investing in Diamondhead, when their money was diverted elsewhere.[7] This claim is supported by the accountant's affidavit, which stated that the prospectus used to solicit the partners promised that their investments would be used to

develop lots at Diamondhead. D.App. at 133. As "creditors" with "claims," therefore, the partners (via their receiver, Cagan) may invoke the rules Arkansas has enacted to regulate fraudulent transfers.

■ These rules provide that a transfer such as the Diamondhead sale is fraudulent as to present or future creditors if it was made without receiving "reasonably equivalent value" in exchange for the property, and if the debtor reasonably should have known that he would incur "debts beyond his or her ability to pay as they became due." Ark. Code Ann. § 4–59–204.[8] If Cagan's view of the facts is correct, then this statute describes the Diamondhead sale to a T: Gordon and Boula caused Equity to write a $3.5 million note to Southmark; Equity received property worth roughly half that amount in exchange; and at the time of the sale, Gordon intended to incur debts beyond Equity's ability to repay.[9] Under Section 4–59–204, the Diamondhead partners are bringing just the sort of claims the statute was drawn to recognize. Since Cagan is receiver for those partnerships as well as for Equity, Arkansas' fraudulent transfer law grants him standing to assert the partners' claims that the Equity–Southmark deal is voidable under that law.

This is not to say that Cagan ultimately will be able to block Southmark's foreclosure of Diamondhead. In provisions outlining creditor claims and defenses, the Arkansas fraudulent transfer statute distinguishes between good and bad faith parties to a fraudu-

---

7. The partners' claim that Equity (via its officers) knew of these fraudulent promises is not inconsistent with Equity's claim that it was looted by its directors' conspiracy with Southmark.

·8. Section 4–59–204 provides (emphasis added):
(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, *whether the creditor's claim arose before or after* the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
  \*   \*   \*   \*   \*   \*
(2) Without receiving a reasonably equivalent value in exchange for the \* \* \* obligation, and the debtor:
  (i) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreason-

ably small in relation to the business or transaction; or
(ii) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

9. Gordon's affidavit states: "When EBI [Equity] purchased Diamondhead, \* \* \* I knew then that EBI had incurred a debt greater than EBI's ability to pay when it became due. I knew \* \* \* that I would have to create new partnerships and use their funds to meet Equity's obligations. I knew this because the mortgage payments were greater th[a]n Boula and my ability to sell lots at least during the first years that EBI owned Diamondhead." D.App. at 130.

lent transfer. Ark.Code Ann. §§ 4–59–207, 208. Even if Diamondhead was sold without "reasonably equivalent value" under Section 4–59–204, Arkansas appears to require Cagan to prove that Southmark acted in bad faith before he can prevent Southmark from foreclosing on Diamondhead. § 4–59–208(b)-(d). The parties have not briefed these provisions before this Court, however, and we need not express an opinion as to what relief Cagan may obtain on remand.

A second problem with the district court's opinion is that it makes an assumption about a disputed issue of fact that should have precluded summary judgment. Fed. R.Civ.P. 56(c); *Donald v. Polk County,* 836 F.2d 376, 379 (7th Cir.1988). The court found that Equity profited by the alleged Diamondhead scheme and thus had no action of its own against Southmark, when the record offers much to contradict this view. Gordon's affidavit suggests that Southmark conspired with Equity's officers to purchase property for Equity at an inflated price, while Equity's money flowed into other pockets and Equity became an indebted husk. The accountant stated that Equity was left impoverished, not enriched, by Gordon's and Boula's dealings with Southmark. Such conduct is usually called "looting."

If looting occurred, then Equity was injured, and Equity's receiver may pursue Southmark to regain some of the misappropriated funds under *Schacht v. Brown,* 711 F.2d 1343, 1348 (7th Cir.1983). *Schacht* involved a liquidator's standing to sue for creditors who complained that "as a consequence of the illegal activities of [the company's] directors and the outside defendants, [the company] was * * * fraudulently continued in business past its point of insolvency and systematically looted * * *." *Id.* at 1347–1348. These facts are strikingly similar to the scheme alleged in today's case. *Schacht* rejected arguments that the corporation had benefitted from its directors' misconduct ("In no way can [looting] be described as beneficial to [the company]") and granted the liquidator standing to pursue creditors' claims on behalf of the looted corporation. *Id.; Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449, 454–456 (7th Cir.1982). *Schacht* allows Ca-

gan to claim under Arkansas law that the Diamondhead transfer was a bad faith attempt to defraud Equity.

In sum, the district court overlooked disputed issues of material fact, and Cagan has standing under Arkansas' fraudulent transfer statute to stall Southmark's foreclosure action until Equity and the Diamondhead partners have had a chance to present their claims at trial. Under Circuit Rule 36, we order this case to be assigned to Judge Grady and consolidated with *Cagan v. Southmark Corp.,* No. 91 C 3720. Until the merits of that case and the present one are finally decided, Southmark may not obtain the relief it seeks.

REVERSED AND REMANDED.

