**In re HARCO COMPANY
OF JACKSONVILLE,
LLC, Debtor.**

No. 04–9020–GLP.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

Aug. 23, 2005.

Nina M. Lafleur, Stutsman and Thames, Jacksonville, FL, for Debtor.

### Findings of Fact and Conclusions of Law

GEORGE L. PROCTOR, Bankruptcy Judge.

This case is before the Court upon the motion filed by LaSalle Bank, National Association, as Trustee for the Registered Holders of LB–UBS Commercial Mortgage Trust 2002–C2, Commercial Mortgage Pass–Through Certificates, Series 2002–C2 ("LaSalle") seeking a dismissal of this Chapter 11 case as a bad faith filing. The Court held hearings on the motion on February 17, 2005, March 29, 2005 and April 14, 2005.[1] Upon the evidence presented, the Court makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

1. The Debtor, Harco Company of Jacksonville, LLC ("Harco" or the "Debtor"), is a Florida limited liability company owned by Harry and Vera Persaud. Harco's sole asset is a 212–unit apartment complex (the "Property") in Jacksonville, Florida, which is encumbered by LaSalle's liens and security interests.

2. Harco purchased the Property in November 2002 for $4.7 million.[2] The purchase was performed through a cash payment and debt assumption: Mr. and Mrs. Persaud contributed $1,075,740 in cash and Harco assumed the first mortgage indebtedness of approximately $3.7 million. LaSalle is the current holder of the mortgage and promissory note.

3. Because the Property was operating at a loss, in October 2003, Mr. Persaud approached Legg–Mason, the loan servicer, about obtaining a second mortgage to provide working capital and to fund various renovations to the Property. Legg–Mason informed Harco that the loan documents prohibited subordinated financing and that the lender was unwilling to con-

---

1. Three separate transcripts were prepared. Accordingly, "T1" will refer to the February 17, 2005 hearing, "T2" refer to the March 29, 2005 hearing and "T3" will refer to the April 14, 2005 hearing.

2. At the time Harco purchased the property, the previous owner represented that the apartment complex was 90% occupied and generating revenues of approximately $90,000 per month. (T2–12). However, subsequent to the purchase, Mr. Persaud learned that the property was generating at approximately $40,000 per month.

sent to any additional encumbrances against the Property.

4. In October 2003, Harco failed to make its required escrow payment, although it did make the required principal and interest payment. Harco's to make the required escrow payment triggered the loan adjustment process. As a result, GMAC, the loan servicer that replaced Legg–Mason, accelerated the loan balance.

5. On March 20, 2004, LaSalle commenced litigation in state court to foreclose on the mortgage. Following the initiation of the foreclosure action, Harco asked that it be allowed to reinstate the loan. In an attempt to raise the money required to reinstate the loan, Mr. Persaud sold property owned by him and his wife. Additionally, the Persauds lent money to Harco.[3]

6. On July 16, 2004, LaSalle filed a motion for summary judgment in the foreclosure action. Harco was unable to produce sufficient funds to stave off the foreclosure sale. The motion for summary judgment was scheduled to be heard on September 1, 2004. Harco did not file any papers in response to the summary judgment motion. On August 31, 2004, Harco filed its voluntary Chapter 11 petition.

7. The schedules and claims register indicate that Harco owes approximately $92,000 to non-insider unsecured creditors, as well as approximately $280,000 to Mr. and Mrs. Persaud. Harco owes approximately $4 million to LaSalle (excluding the defeasance payment), its only secured creditor.

8. The Persauds overtook the management of the Property in July 2004 through their wholly-owned company, Republic Asset Management, Ltd, which consists of two maintenance personnel and two office staff. In November 2004, Harco commenced making adequate protection payments to LaSalle of approximately $26,300 monthly.

On December 7, 2004, three months after the petition date, LaSalle filed a motion to dismiss for a bad faith filing.

9. Subsequent to the filing of the petition, Mr. Persaud moved onto the Property to be the on-site manager. He has waived any claim for compensation during the pendency of the case. Further, he waived any management fees owed to his management company for its services during the pendency of the case.

10. Mr. Persaud testified that he filed the instant case in order for Harco to reinstate the loan with LaSalle, change the interest rate and modify the loan documents to permit subordinate secured financing. (T2–29, 30).

11. Harco has filed a plan of reorganization that contemplates reinstatement of the LaSalle loan and a 100% distribution to unsecured creditors. (Debtor's Exs. 23 and 24). LaSalle filed a plan as well.

12. On the date of the petition, the Property was generating approximately $45,000 per month and the occupancy rate was approximately 50%. As of April 2005, the property was generating approximately $90,000 per month and the occupancy rate was nearly 90%. Revenues are currently exceeding expenses by approximately $10,000 per month, most of which is being reinvested in the Property. (T–3–14).

### Conclusions of Law

■ A case under Chapter 11 may be dismissed "for cause" pursuant to § 1112(b) of the Bankruptcy Code. 11

---

**3.** Between October 2003 and July 2004, the Persauds lent Harco approximately $280,000.

(Debtor's Ex. 2).

U.S.C. § 1112. LaSalle seeks dismissal of Harco's Chapter 11 case alleging that it was filed in bad faith. LaSalle's Motion to Dismiss is premised upon the bad faith doctrine set forth in *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393 (11th Cir.1988), and its progeny.

■ According to the Eleventh Circuit in *Phoenix Piccadilly,* there is no particular test for determining whether a debtor has filed a petition in bad faith. Rather, courts may consider factors that evidence "intent to abuse the judicial process and the purposes of the reorganization provisions" or, in particular, factors that evidence that the petition was filed "to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *See In re Phoenix Piccadilly, Ltd.,* 849 F.2d at 1394–95 (citing *In re Albany Partners, Ltd.,* 749 F.2d 670, 674 (11th Cir. 1984)). The court identified several circumstantial factors that evidence a bad faith filing:

> (i) The debtor has only one asset, in which it does not hold legal title; (ii) The debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors; (iii) The debtor has few employees; (iv) The property is the subject of a foreclosure action as a result of arrearages on the debt; (v) The debtor's financial problems involve essentially a dispute between the debtor and the secured creditor which can be resolved in the pending state court action; and (vi) The timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.

*See Phoenix Piccadilly,* 849 F.2d at 1395.

■ While the factors enunciated in *Phoenix Piccadilly* are helpful in identifying bad faith, the Eleventh Circuit does not appear to suggest that the factors, if applicable, mandate dismissal. *See In re State Street Houses, Inc.,* 356 F.3d 1345, 1347 (11th Cir.2004) (holding that the "*Phoenix Piccadilly* factors are appropriate guidelines for consideration when evaluating whether a Chapter 11 petition in a single asset real estate case was filed in bad faith"); *see also In re Clause Enterprises of Ft. Myers, Ltd.,* 150 B.R. 476, 478 (Bankr.M.D.Fla.1993) (stating that no single factor set forth in *Phoenix Piccadilly* is dispositive as to the issue of the lack of good faith). The court should use its sound discretion in examining each case. *Phoenix Piccadilly,* 849 F.2d at 1395 (stating that bad faith is a finding of fact not subject to any per se approach); *In re Clinton Fields, Inc.,* 168 B.R. 265, 269 (Bankr.M.D.Ga.1994). While the *Phoenix Piccadilly* factors provide guidance, the court must engage in a fact-intensive inquiry that focuses on whether a debtor intended "to abuse the judicial process and the purposes of the reorganization provisions" or "to frustrate the legitimate efforts of secured creditors to enforce their rights," as well as evidence that may indicate the legitimacy of a debtor's Chapter 11 filing. *See Albany Partners,* 749 F.2d at 674 (defining "bad faith"); *see also In re Venice–Oxford Associates Limited Partnership,* 236 B.R. 805, 810 (Bankr.M.D.Fla. 1998) (stating "that the list [of factors] is [not] intended as a mandatory and exclusive itemization of factors to be mechanically applied in every determination of good or bad faith").

■ The first *Phoenix Piccadilly* factor focuses on whether the debtor has only one asset. *Phoenix Piccadilly,* 849 F.2d at 1395. There is nothing inherently improper for a debtor with one asset to attempt to reorganize its affairs under the rehabilitative provisions of the Bankruptcy Code. The purpose of Chapter 11 reorganization is to provide financially distressed

businesses with breathing space in order to return to a viable state, irrespective of the amount of assets such business owns. *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1073 (5th Cir.1986). In the present case, Harco has only one asset. However, this fact does not reveal any indicia of bad faith on the part of the Debtor in its attempt to reorganize.

■ The second *Phoenix Piccadilly* factor involves consideration of the relationship between unsecured debt and total secured debt. *Phoenix Piccadilly*, 849 F.2d at 1395. If the total unsecured debt, excluding claims of insiders, is small in relation to total secured debt, it is a signal that the debtor may have been motivated solely by a desire to remove a two-party dispute from state court to bankruptcy court. In the present case, Harco owes over $92,000 to non-insider unsecured creditors, excluding the $280,000 owed to Mr. and Mrs. Persaud, as compared to approximately $4 million owed to LaSalle (excluding the defeasance payment). However, Mr. and Mrs. Persaud repeatedly lent money to Harco [4] and additionally sold personally owned real property in order to minimize the amount of the company's unsecured debt. Harco, therefore, should not be penalized in a bad faith analysis due the fact that its insiders, Mr. and Mrs. Persaud, contributed to the operations of the business rather than allowing unsecured debt to accumulate.

The third *Phoenix Piccadilly* factor, whether the debtor has only a few employees, is of limited insight in the present case. *Phoenix Piccadilly*, 849 F.2d at 1395. Harco does not have any employees. It does, however, lease a management company, Republic Asset Management, Ltd., which is an entity owned by Mr. and Mrs. Persaud, to perform the management of the apartment complex. The Court acknowledges that this factor, accompanied with other facts, may be insightful as to whether the Debtor abused the reorganization provisions of Chapter 11. However, in the present case, the fact that Harco does not have any employees does not suggest that it intended to abuse the bankruptcy system.

The fourth, fifth and sixth *Phoenix Piccadilly* factors ((iv) the Chapter 11 filing is a result of arrearages on the secured debt, (v) the debtor's financial problems involve essentially a dispute between the debtor and the secured creditor and (vi) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights) are not indicative of bad faith in the present case. *Phoenix Piccadilly*, 849 F.2d at 1395. Harco acknowledges that its primary reason that it filed this Chapter 11 is because of the arrearage on the debt to LaSalle. However, this fact does not mandate a finding of bad faith. The revenues generated from the Property were insufficient to cover the debt payments and rehabilitation of the Property. As a result of delinquency, LaSalle accelerated the debt and commenced the litigation. The need for reorganization was imminent in order to reinstate the loan.

Similarly, although Harco's financial problems essentially involve a dispute between itself and LaSalle, Harco has not acted in bad faith in its relationship with LaSalle. In November 2004, Harco commenced making adequate protection payments to LaSalle. Mr. and Mrs. Persaud have made legitimate efforts, which indicate a sincere desire to reorganize the business.

---

4. *See supra* footnote 3.

Finally, the timing of the Debtor's filing does not evidence intent to delay or frustrate LaSalle's efforts to enforce its rights. If the Court were to consider every bankruptcy filed made for the purpose of taking advantage of the automatic stay as evidence of a bad faith filing, the protection offered by the automatic stay would be meaningless. *In re Jacksonville Riverfront Dev., Ltd.*, 215 B.R. 239, 244 (Bankr. M.D.Fla.1997). In the present case, Harco sought protection under Chapter 11 to stave off the foreclosure sale and to modify the loan documents in order to obtain subordinate secured financing, a permitted use of the bankruptcy system.

Although a mechanical application of the factors set forth in *Phoenix Piccadilly* indicates that this case does in fact have most of the hallmarks of a bad faith filing, when applied to the facts of this case, the factors do not evidence intent to abuse the judicial process or to frustrate the efforts of LaSalle to enforce its rights. Therefore, the Court must further analyze the facts of the case with application to relevant case law.

In the case of *In re Brandywine Associates, Ltd.*, 85 B.R. 626, (Bankr.M.D.Fla. 1988), the court found that a debtor's unlikely ability to successfully reorganize, *inter alia*, is a key factor in dismissing a case as a bad faith filing. In *Brandywine*, the debtor, a limited partnership, owned an apartment complex. *Id.* at 627. The debtor's sole asset was the apartment complex; the debtor had no employees and had no significant unsecured creditors. *Id.* Prior to filing the Chapter 11, the debtor was unable to generate sufficient cash to service the debt. *Id.* at 628. Subsequent to the petition, the limited partners testified that additional money would be available to the debtor. *Id.* However, the court found, based upon the evidence, that sufficient funds would not be forthcoming and

that it would be unlikely that the debtor would be able to meet its debt service obligations in the future and successfully reorganize; and as a result, the court concluded that the case was filed in bad faith and granted the secured creditor's motion to dismiss. *Id.* at 627–28.

■ However, the possibility for a successful reorganization cannot transform a bad faith filing into one undertaken in good faith. *See In re Phoenix Piccadilly, Ltd.*, 849 F.2d at 1394–95. In *Phoenix Piccadilly*, the court held an evidentiary hearing where evidence revealed the debtor's motive for filing its petition. *Id.* at 1393. In a letter to an insider of the debtor, the debtor detailed a plan "to fight [the creditor's] foreclosure action" and "to make whatever legal defenses are appropriate to forestall [the creditor's] actions, including, if advisable, the filing of a Chapter 11 Bankruptcy Petition." *Id.* at 1395. Further, evidence was also revealed that an agent of the debtor threatened to forestall the creditor's foreclosure action "for years" by filing a Chapter 11 case in a location "far from Louisville, Kentucky," the creditor's principal place of business. *Id.* Notwithstanding the debtor's potential for successful reorganization, the Court dismissed the case as a bad faith filing based upon the debtor's intent to frustrate the creditor's rights. *Id.*

In *In re Venice–Oxford Associates Limited Partnership*, 236 B.R. 805, 810 (Bankr.M.D.Fla.1998), the court allowed a single asset debtor the opportunity to reorganize, notwithstanding the applicability of many of the *Phoenix Piccadilly* factors.

A single asset debtor, which owned and operated an apartment complex, filed Chapter 11. *Venice–Oxford Associates*, 236 B.R. at 809–812. The debtor maintained similar occupancy rates as the debtor in the present case (approximately 90 percent subsequent to the filing of the

bankruptcy petition). *Id.* The debtor's monthly operating reports reflected that the debtor's income exceeded its disbursements (without payments to the creditor). *Id.* The debtor engaged a management company to perform the daily, traditional functions of operating the apartment complex. *Id.* The court found no evidence suggesting any wrongdoing on the part of the debtor either before or after the filing of the petition or any unusual or suspect transfers or transactions. *Id.* at 811. Therefore, the court determined that the debtor simply experienced financial difficulties and that it filed its Chapter 11 petition to prevent the loss of its primary asset, a use permitted under the Bankruptcy Code. *Id.* at 812.

In the present case, on the date of the petition, the Property was generating approximately $45,000 per month and the occupancy rate was approximately 50%. As of April 2005, the Property was generating approximately $90,000 per month and the occupancy rate was nearly 90%. Additionally, revenues are currently exceeding expenses by approximately $10,000 per month, most of which is being reinvested in the property. Thus, contrary to the debtor in *Brandywine*, Harco's operating reports indicate that it could likely generate sufficient cash to service the debt, a requisite condition for a successful reorganization. Further, Mr. and Mrs. Persaud have sold property and lent money in order to repay LaSalle, and additionally, Mr. Persaud waived compensation for his services performed during the pendency of the case. Unlike the debtor in *Phoenix Piccadilly*, Mr. and Mrs. Persaud's actions do not illustrate any indicia of bad faith, but rather reflect a sincere attempt to return the business to a viable state. Finally, similar to the debtor in *Venice–Oxford Associates*, the applicability of the *Phoenix Piccadilly* factors does not evidence intent to abuse the judicial process and the purposes of he reorganization provisions.

In the present case, these facts do not rise to the level of egregiousness necessary to conclude that the Debtor is abusing the reorganization process. Therefore, the Court concludes that the case was not filed in bad faith and that Harco should be given an opportunity to reorganize. A separate order will be entered consistent with these Findings of Fact and Conclusions of Law.