Joseph BRAUNSTEIN, Chapter 7 Trustee of TMG Holdings, LLC, Plaintiff,

v.

DANN OCEAN TOWING, INC., Defendant/Third Party Plaintiff

v.

Edwin A. McCabe and Karren K. McCabe, Third Party Defendants.

Joseph Braunstein, Chapter 7 Trustee of TMG Holdings, LLC, Plaintiff

v.

Edwin A. McCabe and Karren K. McCabe, Defendants.

Civil Action Nos. 06–10910–WGY, 06–12027–WGY.

United States District Court, D. Massachusetts.

March 11, 2008.

Joseph A. Regan, Regan & Kiely, LLP, Boston, MA, for Craig J. Ziady (Defendant), Joseph Braunstein (Counter Defendant), Dann Ocean Towing, Inc. (Defendant).

Joseph H. Reinhardt, Atty. at Law, Boston, MA, for Dann Ocean Towing, Inc. (ThirdParty Plaintiff), Karren McCabe (ThirdParty Defendant).

## FINDINGS AND RULINGS [1]

YOUNG, District Judge.

### I. INTRODUCTION

Joseph Braunstein ("Trustee"), the Chapter 7 trustee of TMG Holdings, LLC, brings this turnover claim pursuant to 11 U.S.C. § 542 against Edwin A. and Karren K. McCabe (collectively, "the McCabes"). The Trustee seeks $77,572.69 that the McCabes received from a third party pursuant to an insurance settlement after the *Esperaunce*, the boat on which the McCabes lived, suffered wake damage. In response, the McCabes urge this Court to conclude that they are not liable to the Trustee of the bankruptcy estate for any amount.

John David Blaisdell, Regan & Kiely, LLP, Boston, MA, for Dann Ocean Towing, Inc. (Defendant).

Mark W. Corner, Riemer & Braunstein LLP, Boston, MA, for Dann Ocean Towing, Inc. (ThirdParty Plaintiff), Joseph Braunstein (Plaintiff).

### II. FINDINGS OF FACT

On December 18, 2003, the *Esperaunce*, a houseboat upon which the McCabes resided, experienced significant wake damage while in Boston Harbor. *See* Defs. Trial Brief [Doc. 54] Ex. 2 ("Defs.Facts") at 2; Pls. Facts [Doc. 51] at 2.[2] The *Esper-*

1. The first of these two consolidated cases is an admiralty case arising out of the alleged damage to property from the wake of the tug *Comet*. Over the objection of the Trustee, the Court tried this case to a jury, which returned a verdict in favor of Dann Ocean Towing, Inc. on the ground that Edwin A. McCabe was the authorized agent of TMG Holdings, LLC at the time the admiralty case was settled out of court. The propriety of trying this admiralty case to a jury is of no moment, however, because the Court independently finds correct each of the jury's answers to the questions put to them.

The findings and rulings herein resolve the second of the two cases, the bankruptcy turnover case, which has been tried to the Court.

2. Insofar as the parties did not contest these facts either in their filings or during trial, the Court will take them as true for the purposes of this turnover action.

*aunce* was owned by TMG Holdings ("Holdings"), a limited liability company formed in 2001 by Edwin McCabe for the specific purpose of holding the boat's title.[3] Defs. Facts at 1; Pls. Facts at 2. Holdings, in turn, was managed by The McCabe Group, a professional corporation founded by Edwin McCabe and of which Edwin McCabe was the sole shareholder.[4] *See* Defs. Facts at 1; Pls. Facts at 2.

On September 3, 2003, The McCabe Group filed a voluntary Chapter 11 petition. Defs. Facts at 1; Pls. Facts at 2. On February 20, 2004, Holdings also filed a voluntary Chapter 11 petition. Defs. Facts at 2; Pls. Facts at 2. McCabe, by virtue of his role as the sole shareholder of The McCabe Group and the fact that The McCabe Group was the manager of Holdings, functioned as a debtor-in-possession for purposes of both cases until February 16, 2005. *See* Defs. Facts at 1. On that date, the actions were converted to Chapter 7 liquidation proceedings, and Braunstein was appointed Chapter 7 trustee. *See* Defs. Facts at 1–2; Pls. Facts at 2, 4.

Prior to the Trustee's appointment, the McCabes settled with Dann Ocean Towing, Inc., whose wake was thought to have caused the damage to the *Esperaunce,* in the amount of $95,230.85. Defs. Facts at 2; Pls. Facts at 3. A portion of the settlement was earmarked for alternative living arrangements for and other expenses incurred by the McCabes,[5] but the bulk of the settlement—$77,572.69—was intended to compensate for the damage done to the *Esperaunce.* Trustee's Reply to McCabe

Post–Trial Mem. [Doc. 67] ("Trustee's Reply") at 2. The McCabes deposited the entire amount of the Dann Ocean settlement into their personal bank account, held in Karren McCabe's name, where it comingled with their assets. Defs. Facts at 4; Pls. Facts at 3.

On January 10, 2008, this Court issued factual findings from the bench. First, the Court found that between the time that the *Esperaunce* was damaged and the time the Trustee was appointed, the McCabes spent $47,310.00 to tow the Esperaunce to Gloucester, to haul her out of the water, and to take the initial steps required to restore the *Esperaunce.* Because the work involved dismantling or demolishing portions of the vessel, however, it actually decreased the value of the boat.[6] It is undisputed that the McCabes did not notify the Bankruptcy Court, let alone receive its approval, prior to making these expenditures. This Court found, however, that these expenditures were made in good faith and were reasonable, necessary, and proper expenses.

### III. RULINGS OF LAW

#### A. *Liability for Funds Spent on the Esperaunce*

With a few limited exceptions, a debtor-in-possession has all the rights, powers, and duties of a bankruptcy trustee. 11 U.S.C. § 1107(a). Accordingly, during a Chapter 11 reorganization, in which both The McCabe Group and Holdings were involved, a debtor-in-possession may, *with-*

---

**3.** The *Esperaunce* was Holdings's sole asset. Defs. Facts at 1; Pls. Facts at 2.

**4.** Specifically, the McCabe Group held a ninety-nine percent interest in Holdings; Edwin McCabe held the remaining one percent. Trial Ex. 23 at 7.

**5.** The Trustee concedes that this portion of the settlement is not part of the bankruptcy

estate and asserts no claim to it. Trustee's Reply at 2.

**6.** After the Trustee was appointed, he obtained possession of the *Esperaunce* and later sold the vessel for $42,000.00. Defs. Facts at 5.

*out* being required to give notice or to participate in a hearing, use, sell, or lease property of the bankruptcy estate *if* doing so is in the ordinary course of business. *Id.* § 363(b)(1); *see also id.* § 1108 ("Unless the court ... orders otherwise, the trustee may operate the debtor's business."). Because it is undisputed that the McCabes did not comply with the notice and hearing provision of section 363(b)(1), they will be liable for the expenditures they made with regard to the *Esperaunce* unless those transactions can be said to have occurred in the ordinary course of business.

To determine what constitutes the "ordinary course of business," courts have formulated two tests: the horizontal and the vertical. Under the former, the court asks "whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry." *In re Roth American, Inc.,* 975 F.2d 949, 953 (3rd Cir.1992). The latter, on the other hand, asks whether the transaction subjects a hypothetical creditor "to economic risks of a nature different from those he accepted when he decided to extend credit." *Id.* (internal quotation marks omitted). As a result, the "touchstone of ordinariness" under the vertical test is the hypothetical creditor's "reasonable expectations" about the transactions in which the debtor may participate. *Id.* (internal quotation marks omitted).

■ Holdings is a limited liability company organized to undertake a very narrow set of activities: to own and manage the *Esperaunce.* The parties did not present to this Court evidence of the existence of an "industry" of similarly focused entities nor of the types of transactions into which such companies might regularly en-

ter. This Court, however, is aware that limited liability companies are regularly formed for the purpose of holding, if not boats, real estate. *See, e.g., In re Harco Co. of Jacksonville, LLC,* 331 B.R. 453, 454 (Bkrtcy.M.D.Fla.2005) (describing Chapter 11 case filed by a limited liability company whose sole asset was an apartment complex). The Court considers it evident that, in such a situation, the limited liability company will routinely incur and pay expenses to perform maintenance and repairs on the property. Failing to do so would undercut the entire purpose of the company's existence by diluting the value of the company's asset. Accordingly, this Court rules that the McCabe's efforts to salvage and repair the *Esperaunce,* although ultimately ended prematurely by the conversion to Chapter 7 liquidation proceedings and the Trustee's appointment,[7] are of the "sort commonly undertaken" by similarly situated companies. The horizontal test is therefore satisfied.

Similarly, this Court concludes that the reasonable expectations of a creditor who dealt with Holdings would have encompassed such actions. Holdings' operating agreement specifically empowered the company to "enter into, execute ... perform and carry out contracts of any kind ... necessary to, in connection with, or incidental to the accomplishment of the purposes of" Holdings. Trial Ex. 23 at 1. Creditors thus had notice that Holdings might enter into transactions with third parties to achieve its limited purpose—to hold and maintain the *Esperaunce.* Add to this the natural desire of an owner to fix belongings when they are broken, and creditors reasonably would have expected that the McCabes would attempt to repair the *Esperaunce* were it damaged, contract-

___

7. After the Trustee was appointed, the McCabes properly caused work on the *Esper-* *aunce* to cease. *See* Defs. Facts at 5.

ing with others to do so when needed.[8] Accordingly, this Court concludes that the vertical test is satisfied and rules that the McCabes' expenditures occurred within the ordinary course of Holdings' business of owning the *Esperaunce*.

### B. Application of Lowest Intermediate Balance Test

After subtracting the funds that the McCabes spent to tow and begin work on the *Esperaunce* from the portion of the Dann Ocean settlement in controversy, $77,572.69, the remaining balance is $30,262.69. The McCabes argue that the application of the lowest intermediate balance test precludes a finding of liability for this amount. The McCabes are in error.

 When a debtor-in-possession commingles the funds of the bankruptcy estate with his own, the lowest intermediate balance test requires that a court follow "the fiction that [the debtor] would withdraw non-trust funds first, retaining as much of the trust fund as possible in the account." *Connecticut Gen. Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 619 (1st Cir. 1988) (citing *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924)). In other words, regardless of how much in personal funds the McCabes deposited into their account, the lowest intermediate balance test holds that those funds are the *first* to be withdrawn and that the proceeds of the Dann Ocean settlement are the last. Accordingly, the only instance in which the Trustee would not be entitled to any recovery is if, after the time that the Dann Ocean settlement was deposited into the McCabes' account, the McCabes withdrew all the funds in that account, thereby

reducing the amount on deposit to zero. *See id.*

The McCabes admit that this is not the case; the lowest intermediate balance in their account during the relevant time was $36,218.68. McCabes' Post–Trial Mem. [Doc. 66] at 8. This amount exceeds the $30,262.69 to which the Trustee is entitled. The lowest intermediate balance test thus dictates the conclusion that all but $5,955.99 of the amount in the McCabes' account at the time the Trustee was appointed belonged to the bankruptcy estate.

## IV. CONCLUSION

Accordingly, judgment is granted for the Trustee in the amount of $30,262.69.

SO ORDERED.

---

8. If, for instance, the sole asset of Holdings were a building in which the McCabes lived, no reasonable person would expect the company to do nothing if the pipes in the building burst. The fact that the asset of Holdings was a houseboat and that the nature of the damage differed does not alter this basic reasoning.